DUMAS v AUTO CLUB INSURANCE ASSOCIATION

Docket No. 83982. Argued October 2, 1990 (Calendar No. 2). Decided
    July 31, 1991. Dissenting opinion by LEVIN, J., filed August 2,
    1991. Rehearing denied 438 Mich 1202.

    Richard Dumas and approximately 180 other current and past
    members of the insurance sales staff of the Auto Club Insur-
    ance Association brought an action in the Wayne Circuit Court,
    alleging breach of contract, violations of civil rights, fraud and
    misrepresentation, unjust enrichment, and promissory estoppel
    as a result of a change by the employer of a compensation plan.
    The court, John H. Hausner, J., for purposes of clarity, divided
    the plaintiffs into three groups: Group A was comprised of those
    plaintiffs who claimed that at the time of hiring they were
    informed by the defendant of a seven percent commission
    system, but not that they were informed that the system would
    remain in place for a particular duration; Group B was com-
    prised of plaintiffs who claimed that before or at the time of
    hiring they were told that the system would remain in place as
    long as they were employed or forever or words to that effect;
    Group C was comprised of plaintiffs who claimed that they
    began employment with the same understanding claimed by
    the plaintiffs in Group A, but later were told that the system
    would last as long as they were employed or forever or words to
    that effect. The court then granted summary disposition for the
    defendant. The Court of Appeals, DOCTOROFF, P.J., and CYNAR
    and P. D. HOUK, JJ., reversed in an opinion per curiam with
    regard to the claims for breach of contract and unjust enrich-
    ment (Docket No. 96212). The defendant appeals.

    In an opinion by Justice RILEY, joined by Justices BRICKLEY
    and GRIFFIN, and opinions by Chief Justice CAVANAGH and
    Justice BOYLE, the Supreme Court *held:*

    The plaintiffs may not maintain actions against the defen-
    dant for breach of contract or unjust enrichment.

    No express promises of permanent employment were made to
    the plaintiffs in Group A. Promises claimed by the plaintiffs in
    Group C to have been made subsequent to the time of hiring
    lacked objective support. The defendant was not unjustly bene-
    fited by virtue of changing its compensation plan: with regard
    to Groups A and C, the action was within the realm of defen-

dant's managerial powers; with regard to Group B, the claim lacked record support.

Justice RILEY, joined by Justices BRICKLEY and GRIFFIN, further stated that no express promises of permanency were made to the plaintiffs in Group A; thus, any contractual rights to that effect must result from the legitimate-expectations leg of the holding in *Toussaint v BCBSM,* 408 Mich 579 (1980). However, *Toussaint* involved a claim of wrongful discharge, and, given the traditional reluctance of courts to interfere with management decisions and the needed flexibility of businesses to alter policies to respond to changing economic conditions, its holding should not be extended to cases involving permanent compensation plans.

Any promises claimed by the plaintiffs in Group B to have been made at the time of hiring that they would receive seven percent renewal commissions forever were unenforceable under the statute of frauds as not capable of being performed within one year. These provisions were severable from the remainder of the employment contracts.

Justice BOYLE, concurring, stated that the plaintiffs' proofs are insufficient to support an inference of a contract providing termination only for just cause or an enforceable promise not to change the payment plan; nor was any evidence presented that the employer's statements, interpreted in the light of trade usage or course of performance, would permit the conclusion that the factfinder could draw an inference of a durational term for the method of compensation.

Chief Justice CAVANAGH, concurring in the result, stated that the plaintiffs' claims clearly rest solely on a theory of express oral contract, not a legitimate-expectations theory arising from the defendant's policy manuals. With respect to the plaintiffs in Group A, there is no basis for the express oral contract theory. With regard to all plaintiffs, the evidence presented indicates that summary disposition for the defendant was properly granted.

Reversed.

Justice LEVIN, dissenting, stated that this is not an action for wrongful discharge, but rather an ordinary action for breach of contract for failure to pay agreed-upon compensation for services rendered and to be rendered. The plaintiffs rely solely on claims of express promise, not on implied promises arising out of legitimate expectations. Nor does the question presented concern the scope of *Toussaint.*

The central issue, whether the plaintiffs may maintain actions for breach of an express contract, turns on whether there

is sufficient evidence to justify a finding by the trier of fact that a reasonable person in the position of the plaintiffs would conclude that the defendant intended to pay a seven percent commission on renewals written while, and for as long as, they remained in the employ of the defendant.

The test is objective, focusing on the understanding of a reasonable person in the plaintiffs' position. The subjective intent of the defendant is not relevant except insofar as such a reasonable person would have been, or possibly should have been, aware of the defendant's intent.

The majority incorrectly describes the testimony of forty of the plaintiffs, who recalled being told or informed of a durational term for the promise to pay a seven percent commission on policy renewals, as a vague and precatory promise that the commission system would last forever. However, an even-handed summary of the affidavit on which the majority's description is based would recognize that perhaps only one, or only a handful, of those plaintiffs may have used the word "forever" to describe the durational term. The affidavit cannot properly supply the basis for this portrayal of the plaintiffs' deposition testimony.

The majority incorrectly assumes that the defendant's promise to pay a seven percent commission on new sales and policy renewals did not, as a matter of law, express a durational term. Contrary to the majority's assumption, the words "policy renewals" may be interpreted and understood by the plaintiffs as implicitly stating a durational term, namely, for as long as the defendant and the customer choose to renew a policy. Because the trier of fact appropriately could find that the plaintiffs reasonably might so interpret the promise, it is not, and should not be, determinative whether the plaintiffs recall being told that renewal commissions would be paid on policy renewals "for as long as they were employed" by the defendant, or "forever," or "always." The trier of fact reasonably could find that the promise, so interpreted, states a durational term.

It appears that the plaintiffs would be able to establish at a trial with other evidence that the promise to pay renewal commissions was for renewals written while, and for as long as, the plaintiffs remained in the employ of the defendant.

The duration of the contract, therefore, is determinable and sufficiently definite, although it is uncertain how long the defendant would offer to renew, the customer would choose to renew, and the plaintiffs would remain in the employ of the defendant.

Justice Mallett took no part in the decision of this case.
168 Mich App 619; 425 NW2d 480 (1988) reversed.

*Lopatin, Miller, Freedman, Bluestone, Erlich, Rosen & Bartnick* (by *Richard E. Shaw* and *Sheldon L. Miller*) for the plaintiffs.

*Fox & Grove, Chartered* (by *Kalvin M. Grove, Steven L. Gillman,* and *Allison C. Blakley*) and *Finkel, Whitefield & Selik* (by *Robert J. Finkel*) for the defendant.

Amici Curiae:

*Conboy, Fell, Stack, Lieder & Hanson* (by *Lloyd C. Fell*) for General Motors Corporation.

*Clark, Klein & Beaumont* (by *Dwight H. Vincent, J. Walker Henry,* and *Rachelle G. Silberberg*) for Michigan Manufacturers Association.

*Miller, Canfield, Paddock & Stone* (by *Diane M. Soubly*) for American Society of Employers, Motor Vehicle Manufacturers Association of the United States, Inc., Greater Detroit Chamber of Commerce, and Michigan State Chamber of Commerce.

*Mark Granzotto, Monica Farris Linkner,* and *Charles P. Burbach* for Michigan Trial Lawyers Association.

Riley, J. Two questions are presented in this appeal. First, whether plaintiffs have actions for breach of contract on the basis that they were informed of a particular compensation system upon entering defendant's work force, and the system was subsequently changed. A subissue is whether those plaintiffs who were promised the policy would remain in force "forever" have actions for breach of contract. The second question is

whether plaintiffs can maintain claims for unjust enrichment against defendant.

We hold that the Court of Appeals improperly determined that plaintiffs could maintain actions against defendant for breach of contract and unjust enrichment. Therefore, we reverse the decision of the Court of Appeals.

### I. FACTS AND PROCEEDINGS

In the instant case, approximately 180 plaintiffs are suing the Auto Club Insurance Association. Plaintiffs are current and past members of defendant's insurance sales force.

Upon commencing employment, all plaintiffs were informed that they would be paid under the "Accrued Commission Plan." Under the commission plan, they would receive seven percent[1] commissions on insurance policies sold and upon policy renewals. The commission amounts were tied to policy premiums. Also, for the first year of employment, new salespersons received a base salary to supplant renewal commissions which were unavailable during the first year. All sales employees were on the same compensation system with regard to the seven percent commissions.

Early in 1977, defendant realized a substantial drop in its cash reserves and decided to address the problem. In the wake of analyses by defendant's outside accounting firm, defendant concluded that the payment system for the commissioned sales force was a major contributor to its cash reserve problem.

On December 2, 1977, defendant notified its sales force in writing of its intent to change the compensation plan. Instead of commissions based

---

[1] Salespersons located outside the metropolitan Detroit area received 7.5 percent commissions.

on a percentage of the premiums, salespersons would be paid a flat rate for each policy sold. Though the new plan was implemented by January 1, 1978, during the period from January to July, defendant adjusted compensation so that no employees would experience a reduction in income unless their volume of business fell. The new "unit commission plan" became fully effective July 1, 1978.

On February 8, 1978, a union was certified to represent defendant's sales force. The union filed a complaint with the National Labor Relations Board in May of 1978, alleging unfair labor practices by defendant in unilaterally changing the commission system and refusing to bargain with the union. In August, 1979, the board ruled in favor of defendant, finding that the plan was instituted before the union was certified.

On May 26, 1983, plaintiffs filed a complaint in the Wayne Circuit Court, alleging breach of contract, violations of the Civil Rights Act, fraud and misrepresentation, unjust enrichment, and promissory estoppel.

On January 10, 1984, pursuant to a motion for summary disposition filed by defendant in July of 1983, the circuit court dismissed claims based on new policies, or renewals based on those policies, purchased after the date of the change in payment plans.

On January 18, 1984, plaintiffs filed a motion for rehearing which was denied on February 29, 1984. Subsequently, plaintiffs' application for interlocutory appeal was denied by the Court of Appeals.

On August 19, 1986, the trial court ruled on motions for partial summary disposition filed by defendant and plaintiffs respectively. For the pur-

pose of clarity, the court divided plaintiffs into three groups:

*Group A* consisted of 139 plaintiffs who were informed of the seven percent commission system upon being hired. This group was not promised that the payment system would be in place for any particular duration.

*Group B* consisted of twenty plaintiffs who were told by defendant prior to or at the time of hiring that the seven percent commission plan would last "forever."

*Group C* consisted of twenty plaintiffs. Group C began employment with the same understanding as Group A, but after they began work they were told by defendant that the seven percent plan would last "forever."

With regard to Group A, the court determined that no claim for breach of contract existed and granted summary disposition for defendant. The court reasoned that defendant did not foreclose its right to change its compensation plan.

With regard to Group B, the trial court decided a factual issue existed regarding whether the word "forever" created an enforceable promise not to change the payment plan. However, the court dismissed the claims on the basis of the statute of frauds.

With regard to Group C, the court granted summary disposition for defendant because the oral promise subsequent to hiring lacked consideration.

The court also dismissed plaintiffs' claims of fraud, misrepresentation, promissory estoppel, age discrimination, and unjust enrichment.[2]

On October 3, 1986, the trial court entered the final order regarding summary disposition. Plain-

---

[2] This appeal only concerns the claims of breach of contract and unjust enrichment.

tiffs appealed, and the Court of Appeals reversed the trial court's grant of summary disposition regarding the breach of contract and unjust enrichment claims. *Dumas v Auto Club Ins Ass'n,* 168 Mich App 619; 425 NW2d 480 (1988).

Defendant appealed, and this Court held *Dumas* in abeyance pending decisions in *In re Certified Question, Bankey v Storer Broadcasting Co,* 432 Mich 438; 443 NW2d 112 (1989), and *Bullock v Automobile Club of Michigan,* 432 Mich 472; 444 NW2d 114 (1989). On May 4, 1990, subsequent to the issuance of opinions in those cases, this Court granted leave to appeal. 434 Mich 911 (1990).

II

The first question to be addressed is whether plaintiffs can maintain claims for breach of contract where defendant unilaterally altered the terms upon which plaintiffs were compensated. Plaintiffs do not challenge the new system with regard to new policies purchased after the date of the change. Plaintiffs only challenge the system as it applies to renewals of old policies purchased before the change in compensation plan.

A. GROUP A

Group A was informed of the seven percent commission at the time of hiring, but defendant made no explicit promises to plaintiffs regarding the duration of the policy. In framing the breach of contract action with regard to Group A, it is important to note that because no express promises of permanency were made to plaintiffs, any contractual rights to that effect had to spring from the "legitimate expectations" leg of *Toussaint v Blue Cross & Blue Shield of Michigan,* 408 Mich

579, 598; 292 NW2d 880 (1980).[3] Thus, the threshold inquiry for Group A should be whether to extend the "legitimate expectations" leg of *Toussaint* beyond wrongful discharge disputes to cover an employer's compensation policy.[4] We choose not to extend the "legitimate expectations" cause of action to this case.

In *Toussaint,* this Court held that a company's written policy statements providing for dismissal for just cause may create contractual obligations if the statements give rise in the employee to legitimate expectations of dismissal for just cause. In *Toussaint,* this Court found that the plaintiff's wrongful discharge claim based on written policy statements and express oral statements could be submitted to a jury.

While *Toussaint* created a "legitimate expectations" claim in the wrongful-discharge setting, earlier cases held that written policy statements could give rise to contractual obligations outside the discharge context.[5] Although some of the cases dealt with compensation policies, those policies created contract rights with regard to *deferred* compensation. As Justice RYAN stated in his dissent in *Toussaint, supra,* p 648:

[3] Plaintiffs assert that Group A received the same oral promises as Group B. However, because Group A plaintiffs have no memory that they were promised seven percent commissions "forever," and no evidence on the record supports such a promise, we find as a matter of law that no such express promises were made to Group A.

[4] The legitimate-expectations theory operates outside the principles governing unilateral contract formation. *In re Certified Question, supra,* p 453.

Further, the question whether employee expectations are legitimate is a question of law for the court. See *Bullock, supra* at 507 (separate opinion of LEVIN, J.).

[5] *Cain v Allen Electric & Equipment Co,* 346 Mich 568; 78 NW2d 296 (1956) (severance pay), *Psutka v Michigan Alkali Co,* 274 Mich 318; 264 NW 385 (1936) (death benefits), *Gaydos v White Motor Corp,* 54 Mich App 143; 220 NW2d 697 (1974) (severance pay), *Clarke v Brunswick Corp,* 48 Mich App 667; 211 NW2d 101 (1973) (severance pay), and *Couch v Difco Laboratories, Inc,* 44 Mich App 44; 205 NW2d 24 (1972) (profit-sharing plan).

In each of the cases cited, policy statements by the employer announced the existence of bonus, profit-sharing or pension benefits and the employer or the claimant-employee satisfied the burden of proof that *work already performed was in consideration of the announced benefit and that what was sought was merely deferred compensation.* [Emphasis added.]

In other words, a change in a compensation policy which affects vested rights already accrued may give rise to a cause of action in contract. *In re Certified Question, supra,* p 457, n 17. However, in the instant case, there were no representations made to plaintiffs with regard to deferred compensation. The right to renewal commissions depends on the contract between the agent and insurance company. *Stevenson v Brotherhoods Mutual Benefit,* 317 Mich 575, 580; 27 NW2d 104 (1947). Unless otherwise provided by contract, renewal commissions or future commissions do not rest upon the sale of the original policy. Renewal contracts are separate from the originals, in part requiring additional effort and consideration by salespersons in keeping policies alive. *Id.* at 581. In the instant case, plaintiffs do not contend that their contracts provided for the vesting of renewal commissions upon the sale of original policies.

In fact, each of the cases cited in n 5 operate under traditional contract principles. For instance, in *Cain v Allen Electric & Equipment Co,* 346 Mich 568, 579-580; 78 NW2d 296 (1956), the Court stated:

In short, the adoption of the described policies by the company constituted an offer of a contract. This offer . . . "the plaintiff accepted . . . by continuing in its employment beyond the 5-year period specified in exhibit B . . . ."

While the deferred compensation cases are subject to contract law, the "legitimate expectations" doctrine of *Toussaint* does not follow traditional contract analysis. Therefore, it does not logically follow that *Toussaint* should be extended to the area of compensation. Also, since employees' accrued benefits are protected by the presence of traditional contract remedies, there is no need to extend the expectations rationale to compensation.

In addition to the lack of precedent extending *Toussaint* to facts similar to those presented here, policy considerations weigh in favor of containing *Toussaint* to the wrongful-discharge scenario. Were we to extend the legitimate-expectations claim to every area governed by company policy, then each time a policy change took place contract rights would be called into question. The fear of courting litigation would result in a substantial impairment of a company's operations and its ability to formulate policy. Justice GRIFFIN's majority opinion in *In re Certified Question, supra,* p 456, discussed the nature of a business policy:

> In other words, a "policy" is commonly understood to be a flexible framework for operational guidance, not a perpetually binding contractual obligation. In the modern economic climate, the operating policies of a business enterprise must be adaptable and responsive to change.

Our opinion in *In re Certified Question* was in furtherance of this Court's traditional reluctance to limit or second guess the decision-making ability of business management. As stated in *In re Butterfield Estate,* 418 Mich 241, 255; 341 NW2d 453 (1983), "[a] court should be most reluctant to interfere with the business judgment and discretion of directors in the conduct of corporate affairs."

Much the same conclusion was reached by Justice GRIFFIN in *Bullock v Automobile Club of Michigan, supra,* pp 521-522:

> Even if it can be said that policy considerations were sufficient to justify the *Toussaint* intervention to protect job security, it is difficult to imagine the scope of difficulties and mischief that would be encountered if *Toussaint* were to be extended beyond wrongful discharge into every facet of the employment relationship. Particularly in light of the enormous potential cost to the system that such an extension would entail, including damage to the delicate balance of the employee-employer relationship, I take this occasion to express the view that it would be prudent and wise to leave to the Legislature the public policy decision whether, or to what extent, *Toussaint* should be extended beyond wrongful discharge. [GRIFFIN, J., concurring in part and dissenting in part.]

Given the traditional reluctance of courts to interfere with management decisions and the needed flexibility of businesses to change their policies to respond to changing economic circumstances, we conclude that *Toussaint* should not be extended to create legitimate expectations of a permanent compensation plan. Previous cases have not extended the legitimate-expectations theory to facts similar to these, and we decline the opportunity to extend the theory to compensation terms.

### B. GROUP B

Members of Group B claim they were told before or at the time of hiring that they would receive seven percent commissions "forever" on policies sold. Group B plaintiffs argue that defendant breached the express terms of their employment

contracts by changing the payment system to award a flat rate upon the sale of each renewal policy. We disagree. We find the claimed promise by defendant that the seven percent renewal commissions would last "forever" to be unenforceable under the statute of frauds.

The relevant section of the statute of frauds, MCL 566.132(a); MSA 26.922(a), provides in pertinent part:

> In the following cases an agreement, contract or promise shall be void, unless that agreement, contract, or promise, or a note or memorandum thereof is in writing and signed by the party to be charged therewith, or by a person authorized by him:
>
> (a) An agreement that, by its terms, is not to be performed within 1 year from the making thereof.

To determine whether an agreement comes within this section, the proper inquiry is whether the contract is capable of performance within one year of the agreement. This Court discussed the rule in *Smalley v Mitchell,* 110 Mich 650, 652; 68 NW 978 (1896):

> The mere fact that the contract may or may not be performed within the year does not bring it within the statute. The rule is that if, by any possibility, it is capable of being completed within a year, it is not within the statute . . . . [See also *Fothergill v McKay Press,* 361 Mich 666; 106 NW2d 215 (1960).]

In *Drummey v Henry,* 115 Mich App 107; 320 NW2d 309 (1982), the plaintiff sued the defendant for sales commissions allegedly owed under an oral employment contract. The defendant countered that any such agreement could not be performed

within one year and was unenforceable under the
statute of frauds. The trial court directed a verdict
for the defendant on the basis of the statute of
frauds.

The Court of Appeals reversed, finding that the
record was devoid of evidence showing that the
agreement could not be performed within one
year. The Court stated that it was possible, though
unlikely, that the plaintiff would have made sales
within the first year. Thus, the contract was capa-
ble of performance within one year and outside
the statute of frauds.

Defendant argues that *McLaughlin v Ford Mo-
tor Co,* 269 F2d 120 (CA 6, 1959), controls this
case. In *McLaughlin,* the plaintiff was promised by
the defendant that after he worked for one year in
the cost department, he would be offered a position
in general management. The plaintiff began work-
ing several days after the oral agreement was
reached. After working for more than three years,
and without being offered a general management
position, the plaintiff was discharged.

The plaintiff sued the defendant for failing to
uphold its promise, and, subsequently, the jury
found for the defendant. On appeal, the court
affirmed, finding that the agreement was invalid
under the statute of frauds. The court reasoned
that the parol agreement was invalid because the
plaintiff could not have become a general manager
until more than one year had elapsed from the
time of the agreement. The agreement was not
capable of performance within one year. Thus, the
agreement was barred by the statute of frauds.

In the instant case, the Court of Appeals distin-
guished *McLaughlin* "because plaintiffs [in *Dumas*]
were not seeking to enforce a promise that they
would receive the renewal commissions. Instead,
plaintiffs sought to enforce a promise that the

commissions would be paid as long as plaintiffs were employed by defendant." 168 Mich App 632.

However, we are not persuaded by the Court of Appeals attempt to distinguish *McLaughlin.* We find that plaintiffs were seeking to enforce the payment of seven percent renewal commissions as long as they were employed by defendant. Similar to *McLaughlin* where the plaintiff sued to enforce the agreement with regard to the general management position, in the present case plaintiffs sued to enforce agreements encompassing promised renewal commissions which could not accrue until more than one year from the time of the agreement.

Nor are we persuaded by Justice LEVIN's argument that *McLaughlin* is distinguishable from the present case because *McLaughlin* involves a contract for a definite term. Justice LEVIN states:

> The *Hodge* [*v Evans Financial Corp,* 262 US App DC 151; 823 F2d 559 (1987)] court addressed the kind of contract considered in *McLaughlin,* and in the three Michigan cases on which *McLaughlin* relied, when it said:
> "Under the conventional view of the statute, an oral employment contract for a stated, definite term of years exceeding one year (like those alleged in *Prouty* [*v Nat'l R Passenger Corp,* 572 F Supp 200 (D DC, 1983)] and *Gebhard* [*v GAF Corp,* 59 FRD 504 (DC, 1973)]) is unenforceable on the rationale that the employee's possible death within one year would 'defeat' rather than 'complete' the express terms of the contract." [*Post,* p 612.]

However, the contract in *McLaughlin* was clearly not one for a definite term. In *McLaughlin,* the plaintiff signed an employment agreement providing " 'I understand that my employment is not for any definite term and may be terminated

at any time . . . .' " 269 F2d 123. Furthermore, the court stated that "[i]t will be noticed that the oral contract does not provide for a specified period of employment." *Id.* at 125.

We can certainly agree with Justice Levin that a contract for an indefinite term has traditionally been considered capable of performance within the first year. Thus, employment contracts for indefinite terms are generally outside the statute. We can also agree that the contracts involved in the instant case were of indefinite duration. However, we do not hold, as Justice Levin suggests (*post,* pp 574-575), that each plaintiff's entire employment contract is unenforceable under the statute of frauds. We simply find that the asserted promises of seven percent renewal commissions "forever" are unenforceable. Furthermore, the dissent does not focus on the kind of promise at issue in this case. In the *Hodge* case relied on by the dissent, the primary issue was whether the plaintiff was wrongfully discharged. Thus, the focus was on the duration of the entire employment contract. The instant case differs from *Hodge* because the primary focus is on one term of the entire employment contract that plaintiffs are entitled to seven percent renewal commissions permanently. The dispute here is not over duration of an entire employment contract; nor is it over an employee's discharge.[6]

---

[6] The dissent quotes with approval the *Hodge* case:

"Courts have specifically and consistently held that the presence of bonus or salary terms payable after one year does not bring a long-term indefinite employment contract within the statute." [*Post,* p 613.]

One of the cases cited for this proposition is *White Lighting Co v Wolfson,* 68 Cal 2d 336; 66 Cal Rptr 697; 438 P2d 345 (1968), a case involving a percentage of annual sales payable after one year. There is a difference, however, between bonus or compensation terms pay-

In Michigan, if the terms of a contract are not severable, and part of a contract is within and part is outside the statute of frauds, the entire contract is unenforceable. Where a portion of a contract within the statute of frauds is severable from a part of the contract outside the statute, the severable portion alone will be rendered unenforceable. *Cassidy v Kraft-Phenix Cheese Corp*, 285 Mich 426; 280 NW 814 (1938); 73 Am Jur 2d, Statute of Frauds, § 523, p 153.

In *City of Lansing v Lansing Twp*, 356 Mich 641, 658; 97 NW2d 804 (1959), the Court stated:

As a general rule, a contract is entire when, by its terms, nature and purpose, it contemplates that each and all of its parts are interdependent and common to one another and to the consideration, and is severable when, in its nature and purpose, it is susceptible of division and apportionment.

The singleness or apportionability of the consideration appears to be the principal test. The ques-

able after one year, as in *White Lighting*, and renewal commissions payable after one year. At the end of a year, the work which entitles an employee to a bonus is complete. However, in the instant case, it cannot be said that at the end of the first year, plaintiffs had completed work which legally entitled them to renewals without additional service. See *id.*, p 344, n 3.

Another case cited for the proposition in *Hodge* is *Miller v Riata Cadillac Co*, 517 SW2d 773 (Tex, 1974). In *Miller*, the employee was to be paid an annual bonus. The court found the statute of frauds did not bar enforcement of the contract. However, the court also noted that the bonus could have been ascertained and paid within one year.

Furthermore, there are cases which hold that a bonus payable after one year is void under the statute of frauds. In *Dickinson v Auto Center Mfg Co*, 594 F2d 523 (CA 5, 1979), the plaintiff was hired under an oral contract providing for permanent employment. The plaintiff was promised a stock bonus to be given one year and four months after the contract was made. The court determined that the contract could not be performed within one year and was unenforceable.

In *E D Lacey Mills, Inc v Keith*, 183 Ga App 357; 359 SE2d 148 (1987), the defendants were promised annual bonuses consisting of a percentage of profits. The court decided the promise of a bonus was not to be performed within a year of the agreement, thus it was unenforceable under the statute of frauds.

tion is ordinarily determined by inquiring whether the contract embraces one or more subject matters, whether the obligation is due at the same time to the same person, and whether the consideration is entire or apportioned. If the consideration to be paid is single and entire, the contract must be held to be entire, although the subject thereof may consist of several distinct and wholly independent items.

In *Stevenson v Brotherhoods Mutual Benefit*, 312 Mich 81, 88; 19 NW2d 494 (1945), the Court found that the plaintiff had been properly dismissed under a just-cause contract. The plaintiff was a field representative for the defendant insurance company, and he claimed that despite his dismissal he was entitled to commissions, including renewals, which were due at the time he was discharged. The defendant argued that the plaintiff's breach barred him from recovery of commissions because the contract was indivisible. The Court quoted from Beach on the Modern Law of Contracts, § 731, p 887:

"A familiar and well-settled principle of the common law is that an entire contract cannot be apportioned. The good sense and reasonableness of the particular case must always guide and govern courts in determining whether a contract is divisible or entire. The question depends, to some extent, upon the intention of the parties, and this must be discovered in each case by considering the language employed and the subject matter of the contract. No precise rule can be laid down for the solution of the question. *When the price is expressly apportioned by the contract, or the apportionment may be implied by law, to each item to be performed, the contract will generally be held to be severable.*" [Emphasis in original.]

After viewing the circumstances surrounding the

agreement, the Court decided the contract was severable and the plaintiff could collect the commissions to which he was entitled at the time of his departure.

In the instant case, we find the provisions affording seven percent renewal commissions to plaintiffs severable from the remainder of the employment contracts. The agreements between the parties were that plaintiffs would receive a seven percent commission on each renewal of an old policy. The consideration for each renewal can be clearly and easily apportioned—for each policy successfully renewed by an employee, the employee is paid seven percent of the premium. There is no problem apportioning the consideration with regard to promised renewal commissions, and the nature of the contracts are such that they are "susceptible of division and apportionment." *City of Lansing, supra* at 658.

We find the claimed promise that Group B would remain under the then-existing compensation plan "forever" fits squarely within the statute of frauds and is unenforceable. Members of Group B were allegedly promised before or at the time of hiring that seven percent renewals would last "forever." Under the "Accrued Commission Plan," the renewal commissions could not vest before one year had elapsed from the time of hiring. The agreement with regard to renewals was not capable of performance within one year because it was not possible for renewal commissions to accrue until after the first year. Thus, any promise that the renewal commission plan would last "forever" is unenforceable under the statute of frauds.[7]

---

[7] The dissent argues that even if the contracts for permanent seven percent renewals would be invalid for lack of a written agreement, defendant admitted in court documents that it " 'paid a seven percent commission on new sales and policy renewals.' " *Post,* p 618. Thus, the

Plaintiffs argue that the doctrine of part performance removes the agreement from the statute of frauds. The doctrine is explained in *Guzorek v Williams*, 300 Mich 633, 638-639; 2 NW2d 796 (1942):

> If one party to an oral contract, in reliance upon the contract, has performed his obligation thereunder so that it would be a fraud upon him to allow the other party to repudiate the contract, by interposing the statute, equity will regard the contract as removed from the operation of the statute.

However, in support of their argument that part performance removes the case from the statute, plaintiffs only cite cases involving land. No cases are offered which apply the doctrine in an employment context.

In *Oxley v Ralston Purina Co*, 349 F2d 328, 332 (CA 6, 1965), the court stated that "[t]he doctrine of part performance has historically been applied only to contracts involving the sale of land . . . ." Citing 3 Williston, Contracts (3d ed), § 533, p 770.

In *Ordon v Johnson*, 346 Mich 38, 46; 77 NW2d 377 (1956), quoting Pomeroy, Specific Performance (3d ed), § 100, p 241, it was stated:

> "The clause relating to contracts not to be performed within a year from the making thereof, seems by its very terms, to prevent any validating effect of part performance upon all agreements embraced within it. As the prohibition relates not

dissent argues the written admissions remove the agreements from the statute of frauds. However, just because defendant admitted it promised to pay a seven percent commission on renewals is not to say that defendant admitted that the seven percent system would be permanent. The crux of the dispute is whether the seven percent renewals were permanent terms. Clearly, defendant's statement that it " 'paid a seven percent commission on new sales and policy renewals' " does not amount to an admission of permanency.

to the subject matter, nor to the nature of the
undertaking, but to the *time of the performance
itself,* it seems impossible for any part perfor-
mance to alter the relations of the parties, by
rendering the contract one which, by its terms,
may be performed within the year." [Emphasis in
original.]

We find the doctrine of part performance to be
inapplicable to this case. Plaintiffs offer no support
that the doctrine applies to the situation presented
by this case other than cases involving land. Fur-
thermore, past decisions of this Court have de-
clined to recognize that the part performance doc-
trine operates to remove a contract from the stat-
ute of frauds section concerning contracts not to
be performed within a year. *Ordon v Johnson,
supra; Whipple v Parker,* 29 Mich 369 (1874).[8]
Accordingly, we decline to apply the part perfor-
mance doctrine to the facts of this case.[9]

There being no enforceable agreement that
plaintiffs would be paid a seven percent commis-
sion "forever," members of Group B find them-
selves in the same position as members of Group

[8] Nonetheless, Michigan cases do permit recovery under the theory
of quantum meruit where a party has performed and conferred a
benefit on another party under a contract within the statute of
frauds. *Whipple, supra; Fuller v Rice,* 52 Mich 435; 18 NW 204 (1884);
*Smith v Chase & Baker Piano Mfg Co,* 185 Mich 313; 151 NW 1025
(1915).

[9] Courts applying Michigan law have recognized exceptions to the
one-year provision on the basis of theories other than part perfor-
mance: *Reeck v Caloy Corp,* 329 Mich 453; 45 NW2d 349 (1951)
(substantial consideration given); *Pursell v Wolverine-Pentronix,* 44
Mich App 416; 205 NW2d 504 (1973) (equitable estoppel); *McMath v
Ford Motor Co,* 77 Mich App 721; 259 NW2d 140 (1977) (promissory
estoppel); *Rowe v Noren Pattern & Foundry Co,* 91 Mich App 254; 283
NW2d 713 (1979) (equitable estoppel); *McLaughlin, supra* (considera-
tion separate and apart from performance); *Oxley, supra* (equitable
estoppel). Since plaintiffs only rest on their part performance and
unjust enrichment arguments to avoid the statute of frauds, we do
not discuss these other theories. Plaintiffs' claims of unjust enrich-
ment are discussed in section III.

A, and we have already determined that members of Group A cannot maintain actions for breach of contract against defendant.

### C. GROUP C

Members of Group C claim they were told at some point after they were hired that they would receive seven percent commissions "forever." Group C plaintiffs also argue that defendant breached the express terms of their employment contracts by changing the payment system to award a flat rate upon the sale of each renewal policy. Again, we disagree.

When analyzing employment contracts, it is important to keep in mind that parties begin the relationship with complete freedom. *Toussaint, supra,* p 600. An employer retains its managerial powers and prerogatives unless they are limited by contract. As Justice GRIFFIN stated in *Bullock, supra,* pp 519-520, "[a]n employer's intention to give up permanently a right so fundamental as the ability to make changes in its method of compensation is not to be lightly inferred." (GRIFFIN, J., concurring in part and dissenting in part.)

Our inquiry must focus on the intent of the parties and whether they intended to bind themselves to a seven percent renewal commission permanently. In deciding whether mutual assent existed to permanently freeze the renewal commission, we employ an objective test, "looking to the expressed words of the parties and their visible acts." *Goldman v Century Ins Co,* 354 Mich 528, 535; 93 NW2d 240 (1958); *Stark v Kent Products, Inc,* 62 Mich App 546; 233 NW2d 643 (1975). It is proper to consider the circumstances at the time the asserted contracts were made to determine the intent of the parties. *W J Howard & Sons, Inc v*

*Meyer,* 367 Mich 300; 116 NW2d 752 (1962); *Miller v Stevens,* 224 Mich 626; 195 NW 481 (1923). This is especially true in oral contracts where the parol evidence rule does not impair consideration of extrinsic facts. *Redinger v Standard Oil Co,* 6 Mich App 74; 148 NW2d 225 (1967).

Upon reviewing the circumstances of the alleged promises to Group C, we find as a matter of law that mutual assent was lacking.

At the time of hiring, members of Group C were in the same position as members of Group A. No promises were made regarding the duration of the commission plan, yet plaintiffs in both Groups A and C accepted employment. Group C alleges that after accepting employment, defendant made extraordinary contractual promises that the commission system would be in place "forever." However, it is not at all clear from the statements allegedly made to members of Group C that defendant intended to bargain away its right to change the method of compensation. The meaning of the statements could be interpreted in several ways falling short of a contractual commitment. The statements could have been intended to bolster morale and enhance employee pride in the company. It is also possible the statements were merely stated opinions of management representatives that the company would not change its commission rate. Another possible interpretation is that the statements were .designed as assurances by management that in the foreseeable future, there were no rate changes planned.

Whether the statements rise to contractual obligations depends on the context and circumstances in which the statements were made. In analyzing the parties' intent, we note that the record does not reflect that any negotiations took place between plaintiffs and defendant. All indications are

that the comments were isolated. Also, we find the term "forever" is inherently vague. If the parties had negotiated the duration of the compensation plan, it is unlikely they would have characterized the agreement with such a precatory expression. Furthermore, in the employment context, this Court has been reluctant to accept terms which connote permanent or lifetime employment at face value. In *Lynas v Maxwell Farms,* 279 Mich 684; 273 NW 315 (1937), the Court determined that absent distinguishing features or consideration in addition to services to be performed, a contract for permanent employment should be interpreted to be terminable at the will of either party. Although *Lynas* deals with discharge as opposed to compensation terms, a contract which forever restricts an employer's right to change compensation has the same effect of permanently tying an employer's hands on a term of employment.

We note that nothing was offered by plaintiffs in addition to their continued employment that would reasonably prompt defendant to make such extraordinary contractual commitments.[10] We are persuaded that it defies logic to believe that defendant would intend to bind itself to a specified renewal commission on the basis of isolated statements when plaintiffs had already accepted employment without the benefit of durational guarantees with regard to compensation. It also defies logic that defendant would enter into these commitments after, as opposed to before, being hired. It is more reasonable to believe that defendant would legally obligate itself to such a promise before hiring in order to attract an employee or induce acceptance of employment. In the case of Group c, we can perceive no manifest reason for

[10] We do not address, directly or indirectly, whether sufficient consideration existed to modify any earlier agreement.

defendant to offer a permanently fixed rate on renewals.

We also find it relevant to our inquiry into mutual assent to examine the changes in the compensation and commission system with regard to sales representatives in the years leading up to the employment of plaintiffs. In 1940, defendant adopted a seven percent commission for all representatives.[11] In 1958, the commission for out-state salespersons was changed to seven and one-half percent. From 1962 to 1976, most salespersons were hired pursuant to the "Accrued Commission Plan," which is the system applicable to this case. In 1963, a merit commission plan was adopted which allowed a salesperson to earn more or less than seven percent on the basis of the individual's productivity. This plan was discontinued after nine months. In 1964, defendant established a high-risk insurance company, but rather than base commissions on the higher premiums, defendant paid commissions on the basis of the lower premiums of the standard company. However, this plan was discontinued after a short while. Throughout the 1960s and 1970s, defendant made several changes in its compensation and commission plan for membership sales.

These changes made throughout the years suggest that it is unlikely that defendant would permanently guarantee a particular renewal policy. The numerous recent fluctuations show the company's changing compensation program and demonstrate that it was unreasonable for members of Group c to maintain any belief that their commission plan was to be locked in permanently. For these reasons, we find that in objectively reviewing

[11] These undisputed facts can be found in the affidavits of Erwin Judge, who was the director of sales administration for the Automobile Club of Michigan.

the circumstances of this case, there was no mutual assent to establish seven percent renewal commissions permanently. We are persuaded that defendant did not intend to bargain away its right to make adjustments in its compensation plan.

### III

Plaintiffs allege that defendant was unjustly enriched as a result of changing compensation plans. The trial court disagreed and granted summary disposition for defendant. The Court of Appeals reversed the decision of the trial court.

The Court of Appeals described the basis of an unjust enrichment claim:

> The process of imposing a "contract-in-law" or a quasi-contract to prevent unjust enrichment is an activity which should be approached with some caution. The essential elements of such a claim are: (1) receipt of a benefit by the defendant from the plaintiff and, (2) which benefit it is inequitable that the defendant retain. [168 Mich App 638.]

With regard to Groups A and C, since we have determined that defendant had the right to impose a new compensation plan, we find that defendant, as a matter of law, was not unjustly enriched. Defendant simply exercised its prerogative to change compensation. With regard to members of Group B, the statute of frauds does not bar the assertion of an unjust enrichment claim.

The Restatement Restitution, § 1, comment c, p 13, states in part:

> *Unjust retention of benefit.* Even where a person has received a benefit from another, he is liable to pay therefor only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it.

In *Hollowell v Career Decisions, Inc,* 100 Mich App 561; 298 NW2d 915 (1980), the plaintiff sued the defendant for unjust enrichment after she was terminated from her job of vice president of an employment agency.[12] The Court ruled that summary judgment in favor of the defendant was proper under GCR 1963, 117.2(3)[13] because the plaintiff failed to offer any proof that the defendant benefited from her services, and she "failed to offer any proof to indicate that the value of the services she performed exceeded the compensation she received." *Id.* at 571.

In the instant case, we find that there is no genuine issue of material fact with regard to the unjust enrichment issue and that members of Group B may not maintain actions for unjust enrichment.

Under the circumstances presented, no evidence suggests that defendant has *unjustly* benefited by the change in compensation policies. There is no dispute that a worsening financial condition within the company prompted the decision to change compensation plans. Continued significant decreases in the reserves of the business threatened availability of insurance funds. Also, the plaintiffs were well informed of the compensation policies in force at any given time, and there is no evidence to indicate that plaintiffs were not paid for any sale of a membership or policy. Furthermore, plaintiffs have offered no proof which would support a finding that the value of the services they performed exceeded the compensation received in return.

The dissent states that

---

[12] The plaintiff also brought claims for breach of contract, fraud, and slander.

[13] MCR 2.116(C)(10) is the current equivalent of former rule 117.2(3).

the sales representatives are entitled to recover
the reasonable value of their services in building
the books of business *if* the promise to pay a seven
percent commission on policy renewals of old sales
was in part a promise to pay deferred compensa-
tion for making the new sale. [*Post,* pp 622-623.
Emphasis in original.]

Plaintiffs do not argue that the renewals were a
form of deferred compensation which vested at the
time of the original sale. In fact, it is undisputed
that to earn renewal commissions, plaintiffs had to
continue to service and renew their policies.[14]
Given the good-faith actions of the company, the
fact that plaintiffs were always compensated for
their sales, the lack of evidence suggesting that
the compensation was not in line with the ser-
vices, and the absence of an agreement providing
that renewals are a form of deferred compensa-
tion, we find that defendant was not unjustly
enriched by the change in the policy. We note
further that there is no factual basis supporting
plaintiffs' allegations that defendant confiscated
and diminished the value of their books of busi-
ness.[15]

### IV. CONCLUSION

As a matter of law, we would hold that plaintiffs
are unable to bring actions against defendant for
breach of contract. With regard to Group A, there
were no express contracts that plaintiffs would
"forever" be entitled to seven percent renewal

[14] This is established in the affidavit of Erwin Judge.

[15] By way of illustration of such a loss, plaintiffs present a hypothet-
ical chart comparing plaintiffs' income under both plans for the years
1978 to 1989. The assumption underlying the hypothetical chart is
that premiums increased at the rate of inflation, and the commissions
under the new plan remained static for at least twelve years. Plain-
tiffs concede that the presentation is not factual.

commissions, and we decline to extend the legiti-
mate-expectations theory beyond the wrongful-
discharge context. Any promise made to members
of Group B was unenforceable under the statute of
frauds because the asserted agreement regarding
renewal compensation was not capable of perfor-
mance within one year. With regard to members
of Group C, we find that the circumstances demon-
strate that no mutual assent was reached on the
permanency of the commission plan with respect
to renewals.

Finally, we would hold that defendant was not
unjustly enriched by virtue of changing its com-
pensation scheme. The change was within the
proper realm of its managerial powers with regard
to members of Groups A and C. With regard to
Group B, the record lacks evidence which would
support a claim for unjust enrichment.

We reverse the decision of the Court of Ap-
peals.[16]

BRICKLEY and GRIFFIN, JJ., concurred with
RILEY, J.

BOYLE, J. (*concurring*). I agree with the reversal
of the decision of the Court of Appeals and with
part II(C) and part III of Justice RILEY's opinion.[1]

Plaintiffs' proofs are insufficient to support the
inference of a just-cause contract or an enforceable
promise not to change the payment plan. The
circumstances identified as guidelines[2] with regard

[16] This opinion responds to the latest draft of a proposed dissent
circulated, but as yet not filed, by Justice LEVIN.

[1] This opinion responds to the latest draft of a proposed dissent
circulated by Justice LEVIN.

[2] Among the circumstances identified as objective indications of
intent are clarity, specificity, and lack of ambiguity of oral state-
ments; whether there were specific negotiations for job security; the
nature of the position; and whether, if policy statements are relied on,

to the intent to create a just-cause contract in
*Rowe v Montgomery Ward & Co, Inc,* 437 Mich
627; 473 NW2d 268 (1991), are not present.[3] Nor
have we been provided with any submissions, sug-
gestions, argument or offer of proof that the em-
ployer's statements, interpreted in the light of
trade usage or course of performance, permit the
conclusion that the factfinder could draw an infer-
ence of a durational term for the method of com-
pensation.[4]

I

Assuming, arguendo,[5] that a termination for-
cause employment term would support the infer-
ence of a durational term for the method of com-
pensation,[6] there is no basis on this record to infer

they support or undercut a reasonable belief that a promise of job
security was being extended.

[3] It is not disputed that the unit compensation plan was undertaken
as a business decision after an independent investigation indicated a
relationship between the company's dwindling cash reserves and a
significant percentage increase in compensation costs to the commis-
sioned sales force. The situation is not within the ambit of decisions
recognizing an implied covenant of good faith and fair dealing in
employment-at-will arrangements to prevent the forfeitures of bene-
fits almost earned. *Fortune v Nat'l Cash Register Co,* 373 Mass 96;
364 NE2d 1251 (1977); Perritt, Employee Dismissal Law & Practice
(2d ed), § 4.11, pp 191-197.

[4] I agree with Chief Justice CAVANAGH that it is inappropriate to
address the legitimate-expectations issue.

[5] The dissent would extend the contract prong of *Toussaint v Blue
Cross & Blue Shield of Michigan,* 408 Mich 579, 598; 292 NW2d 880
(1980), to a compensation term and infer a good-cause term. The
plaintiffs at oral argument contended that the just-cause agreement
together with the compensation promise implied at least that the
salary be a fair and reasonable salary.

[6] It is suggested that the just-cause question is not in issue because
the defendant did not assert that there was no factual support for the
claim. The Blakley affidavit raised the factual predicate for the
defendants' claims, the plaintiffs countered with the policy manual,
and the defendants argued that "plaintiffs who were allegedly told at
the time of hire or thereafter that the percentage-based commission
would never change must be treated in the same manner as the
plaintiffs who admittedly were not made such a promise," memoran-

other than employment-at-will contracts and no ground to question the employer's good faith. Plaintiffs simply suggest that they were told that if they worked hard in the beginning of their careers they would reap the benefits.[7] These were statements that good performance would be rewarded; they were not statements implying a restriction on employment at will, *Dzierwa v Michigan Oil Co,* 152 Mich App 281; 393 NW2d 610 (1986); *Triplett v Electronic Data Systems,* 710 F Supp 667, 673 (WD Mich, 1989). This is no more than most employees concerned with building a career hope to achieve. To allow a jury to find on these facts a term limiting termination only to just cause would substitute for the presumptive employment-at-will term a dismissal-for-cause rule in every employment arrangement in which predictions of a rosy future were made to prospective employees. *Cummings v Kelling Nut Co,* 368 Pa 448; 84 A2d 323 (1951).

Plaintiffs' commission claims, properly analyzed, assert an irrevocable right to renewal commissions on automobile insurance arising in the context of an employment-at-will relationship,[8] on the basis

dum in support of partial summary judgment, § 2, p 8, and there was an insufficient evidentiary basis to find other than an at-will contract, § 2(b), p 9, n 11. Moreover, plaintiffs specifically relied on the just-cause theory at oral argument contending that a just-cause term necessarily precluded the adjustment of compensation.

[7] Nor does this case raise the issue regarding whether a durational term for a reasonable period of time may be supplied to permit an employee at will to recoup an investment in time and money. See Keller, Ackland & Glad, *The evolving doctrine of wrongful termination of employment: Practical considerations regarding employment and insurance agent relationships,* 32 Fed'n Ins Couns Q 105 (1982). Further, since the plaintiffs do not rest their claims on an implied obligation to continue the agreement for a reasonable time, we have no occasion to consider whether and how such an implied-in-law "gap filler" might be appropriate when an employment agreement is silent regarding duration. Calamari & Perillo, Contracts (3d ed), § 2-9, p 59, n 17.

[8] Justice LEVIN takes the position that when the Auto Club "agreed

of a promise to pay seven percent (Group A) and a promise to pay seven percent "forever" (Groups B and C).

II

For the reasons stated by Justice RILEY in Rowe,[9] I would hold that plaintiffs in Group A have not alleged circumstances that would permit the factfinder to conclude that the offer of specific compensation would continue for the duration of employment (or beyond). With regard to Groups B and C, I also find that the facts alleged are insufficient to permit a factfinder to conclude that the employer was making a commitment amounting to a promise of a permanent renewal compensation plan.[10]

that the sales representatives would be paid a seven percent commission on policy renewals of old sales, it agreed, by implication, that the sales representatives would not be deprived, as a result of discharge from employment other than for good or just cause, of the opportunity to earn the seven percent commission on policy renewals of old sales by exerting whatever additional effort, if any, might be required to obtain such renewals." *Post,* p 605. By this construction, Justice LEVIN seeks to avoid the underlying assumption that if the employment is at will, the terms can be modified at will. The logic of this assumption is that the employer can always terminate an employment-at-will relationship and rehire the employee with different benefit terms. *Hathaway v General Mills, Inc,* 711 SW2d 227 (Tex, 1986); *Wakefield v Northern Telecom, Inc,* 769 F2d 109 (CA 2, 1985) (applying New Jersey law). See anno: *Sufficiency of notice of modification in terms of compensation of at-will employee who continues performance to bind employee,* 69 ALR4th 1145.

[9] Plaintiffs contend that Group A claims rest on an express promise. As in *Rowe,* plaintiffs' claims rest on an express statement, and the issue is whether an omitted durational term can be supplied.

[10] The dissent in *Rowe* observes that the signers of the lead opinion in *Dumas* proceed "on the apparent premise that such a promise, if made, would be enforceable," p 694. In view of my conclusion that the facts are insufficient to permit such a finding, I need not reach the question, not decided in *Toussaint, supra,* with regard to whether, if a sufficient "promise" of permanent compensation was made, it would be enforceable on a contract theory in an at-will context. See Pettit, *Modern unilateral contracts,* 63 Boston U L R 551, 555-557 (1983).

A

Plaintiffs' eighth amended complaint does not distinguish between old and new sales, but rather contends that the Auto Club was perpetually obligated to maintain the compensation scheme.[11] The lead opinion and the dissent agree that the durational term now claimed is limited to renewals of old sales. Even if this characterization is correct, it ought logically to follow that if renewals of old sales were intended to be a form of deferred compensation, they would be payable regardless of termination. The promises alleged are indefinite, not only in the sense that there is no durational term for renewals of "old sales," but also because there are two possible constructions of the duration of "renewal of old sales" claim—renewals of old sales as long as employed—and renewals of old sales whether employed or not.

As observed in the concurrence in *Rowe*, even under the Uniform Commercial Code's liberalized requirements of definiteness in relation to commercial contract formation, there must be a manifest intention to make a contract and a reasonably certain basis for giving an appropriate remedy. UCC 2-204(3). Thus, the issue here is not how the plaintiffs characterize their claims before this Court, but, rather, what the Court can discern regarding the parties' intentions at the time the obligations allegedly were undertaken.

To be sure, courts look to rules of construction in interpreting ambiguous terms or to supply omitted terms reflecting either the actual expectation

---

[11] In their eighth amended complaint, ¶ 11, plaintiffs allege that they were "precluded from receiving their full 7.0% commission on all new policies sold and all pre-existing policies renewed." In ¶ 20, plaintiffs further allege that they were "promised that they would earn a 7% commission from the renewal of pre-existing clients and from all new policies sold . . . ."

of the parties, if that appears, or objective expecta-
tions. Farnsworth, Contracts, §§ 7.15-7.16, pp 517-
526. Stated otherwise,

> Rules of construction serve the legitimate pur-
> pose of aiding courts in their quest to ascertain
> and give effect to the intention of parties . . . .
> They are not meant to be applied as a substitute
> for that quest. [*Burns Mfg Co, Inc v Boehm,* 467
> Pa 307, 313, n 3; 356 A2d 763 (1976).]

The difficulty with applying concepts such as an
implied obligation to render coöperation, *post,* p
605, or trade usage to supply a term in this case,
*post,* pp 602-603, is that the former principle is
irrelevant in this context,[12] and the Court has not
been supplied with guidance supporting plaintiffs'
construction with regard to the latter. Thus, again
assuming that a promise of compensation for a
durational term would be enforceable, summary
disposition might have been appropriate if there
was a basis for the factfinder to draw an inference
that the parties expected that a prevailing
commercial practice obtained.[13] None has been
advanced. Not even the apparent term of art
"book of business,"[14] that troubled us in

---

[12] The duty of coöperation is imposed in all contracts that leave the
particulars of performance to be specified by one party, or where one
party's coöperation is necessary to, or materially affects, the perfor-
mance of the other. See, e.g., the analogous provision of UCC 2-311(1),
(3).

[13] The term "renewal commission" is defined in *Gram v Liberty
Mutual Ins Co,* 391 Mass 333; 461 NE2d 796 (1984), as damages
measured by the annual renewal commissions payable under the
compensation agreement in effect at time of discharge. Future pre-
mium levels and future policy changes are not included because they
are speculative.

[14] The term "expirations" has a definite meaning in insurance and
refers to information enabling contact with the insured to secure
another contract. An agency functioning under the American Agency
System which usually represents several insurance companies is the
owner of records and expirations. An agency serving a direct writing

*Bullock*[15] has been fleshed out for its effect on the question at issue. On the record, briefs, and argument submitted here, it is entirely speculative that trade usage or other rules of construction assist in supplying omitted durational terms or as bearing on the parties' intent. Nor, of course, can speculation that representations were made to plaintiffs with regard to "deferred compensation," *post,* p 600, create a jury submissible issue regarding the parties' intent. Unlike the benefit cases noted in Justice RYAN's dissent in *Toussaint v Blue Cross & Blue Shield of Michigan,* 408 Mich 579, 648; 292 NW2d 880 (1980), in which the employer or the claimant employee "satisfied the burden of proof that work already performed was in consideration of the announced benefit and that what was sought was merely deferred compensation," plaintiffs do not characterize their claims as "deferred compensation," nor do they contend they have fully performed.

Viewed in a light most favorable to plaintiffs, we are left with the precatory term "forever" appended to descriptions of the compensation system, with the fact that the persons making such statements were sales managers and that the state-

contract represents a single company and must place all insurance with that company and, customarily, does not own the record in the hands of the agent. 4 Couch, Insurance, 2d, § 26A:260, pp 492-496; anno: *Rights to expirations as between insurer and insurance agent or broker,* 88 ALR3d 1142; *Woodruff v Auto-Owners Ins Co,* 300 Mich 54; 1 NW2d 450 (1942).

[15] In *Bullock v Automobile Club of Michigan,* 432 Mich 472, 483; 444 NW2d 114 (1989), the plaintiff alleged an oral promise of job security. The motion for summary disposition pursuant to GCR 1963, 117.2(3) was filed before any meaningful discovery. We noted the "isolation" in which the alleged promise was reviewed and the presence of factors such as the "book of business" which "may" constitute distinguishing features. *Id.* at 484, n 11. We held that whether the alleged promise was either intended by defendant (or understood by *Bullock*) as an enforceable obligation "must await further discovery and *perhaps* trial." *Id.* at 483. (Emphasis added.)

ments were made, in some cases, in response to concerns that commissions were low.

In order to give legal effect to these claims, we would have to conclude that a missing term central to the intent of the parties could be inferred by the factfinder, i.e., that the method of compensation would never be changed. We would, in effect, be allowing the factfinder to determine that, despite the fact that the defendant retained the right to discharge these employees when it hired them, it nonetheless intended to assume the risk of a drop in its cash reserves.

Both the Restatement and the UCC express a preference for finding an enforceable obligation and preventing an evasion of obligation by resort to a claim of indefiniteness. Restatement Contracts, 2d, § 33(b); UCC 2-204(3). Under both the Code and Restatement, however, the parties must intend to contract, and there must be a reasonably certain basis for giving an appropriate remedy. Calamari & Perillo, Contracts (3d ed), § 2-9, p 66.

In this case, there is neither an objective manifestation that the employer was making a commitment that amounted to a promise nor a reasonably certain basis for giving an appropriate remedy. Aside from the precatory term "forever," there is simply no objective indication that overcomes the presumption that there was no durational term for compensation with respect to future renewals.[16]

---

[16] Observing, as Justice GRIFFIN did, in *In re Certified Question, Bankey v Storer Broadcasting Co*, 432 Mich 438, 446-447; 443 NW2d 112 (1989), that unilateral contract theory poses conceptual difficulties in contracts implied in fact, Professor Perritt suggests that closer to employment law are cases of modification of benefit promises under the Employment Retirement Income Security Act, 29 USC 1001-1461, and collectively bargained individual right analyses, and that these cases suggest the following principles to guide employer modification of employment security promises in the implied-in-fact context:

(1) The employer should be presumed to have reserved the

B

In *Toussaint, supra* at 613, the Court expressly recognized a nonpromissory basis of "a situation 'instinct with an obligation'" distinct from and independent of contract analysis.

Most recently, in *In re Certified Question, Bankey v Storer Broadcasting Co,* 432 Mich 438; 443 NW2d 112 (1989), we unanimously reaffirmed the principle that it is socially desirable to recognize the enforceability of personnel policies. In doing so, we explicitly acknowledged that policy considerations extraneous to the contract-as-promise analysis, such as stability and consistency in the work environment, were the judicial premises underlying the legitimate-expectations prong of *Toussaint.*

In this case, plaintiffs rely principally on a promissory theory of liability. Thus, we are not faced with "[t]he crucial, difficult question facing the courts in the modern cases . . . not whether to choose unilateral or bilateral contract analysis, but whether to employ any contractual analysis at all." Pettit, *Modern unilateral contracts,* 63 Boston U L R 551, 575 (1983). Because plaintiffs assert a promissory claim, we deal with the principles of individual autonomy on which the law of private contract is based, and focus on the promissory basis of the asserted obligation.

As Professor Pettit observes,

Any assessment . . . of the appropriateness of modern judicial use of unilateral contract theory

---

right impliedly to modify the employment security promise any time before a termination is effected; and

(2) A course of conduct involving successive employer modification is evidence that the right to modify was reserved and that employees could not reasonably expect otherwise. [Perritt, *supra,* § 4.19, p 218.]

must focus on the promissory basis of the asserted obligation . . . . Are courts imposing liability because of words or actions of the defendant manifesting an intention to make a commitment, or are they using unilateral contract as a device to enforce obligations arising from some sense of community standards? . . . If the defendant's commitment-making actions do not predominate, unilateral contract is an inappropriate rationalization that allows judges to avoid confronting their true motivations. [*Id.,* pp 576-577.]

Thus, unless there is a nonpromissory basis for imposing an employer obligation,[17] analysis of unilateral contract claims in implied-in-fact employment cases must begin with the question whether the words or action of the defendant manifested an intention to make a commitment.

In the absence of a viable unjust enrichment claim, of promissory estoppel, of bad faith, or a public policy ground for a different result, we have no basis on this record to permit a jury to impose promissory liability on the defendant. Because defendant's commitment-making actions do not predominate, it cannot be truthfully said that a reasonable juror could find that the defendant assumed the obligation claimed. *Id.,* p 577.

Therefore, I agree with the lead opinion and would reverse the decision of the Court of Appeals.

CAVANAGH, C.J. (*concurring in the result*). It is

---

[17] The instability of employment jurisprudence, observed by Justice RILEY in *Rowe* is in part a function of the fact that courts have used unilateral contract theory as a vehicle for expanding employer obligations on the basis of the courts' unarticulated nonpromissory notion of abusive employment practices. If the bar distinguishes the theories and confronts judges with the arguments for and against nonpromissory theories of liability, and if judges are willing to openly confront their true motivations, we may at least produce a forum for debate on the most "critical and difficult question" in employment law— whether and under what circumstances it is appropriate to apply a court's sense of community standards as a basis for recognizing enforceable obligations in employment relationships.

clear that plaintiffs' claims before this Court rest solely on an express oral contract theory, not on a legitimate-expectations theory arising from defendant's policy manuals. I therefore believe that Justice RILEY's discussion of the legitimate-expectations issue in part II(A) of her opinion is unnecessary dicta.[1] For reasons noted by Justice RILEY in part II(A), however, see *ante,* p 529, n 3, I agree that there is simply no basis in this case for the Group A plaintiffs' express oral contract theory.

With regard to the Group B and Group C plaintiffs, and with regard to the issue of unjust enrichment, I agree with the result reached by the majority. I disagree with those aspects of Justice RILEY's and Justice BOYLE's analyses which draw upon Justice RILEY's analysis in *Rowe v Montgomery Ward & Co, Inc,* 437 Mich 627; 473 NW2d 268 (1991), for reasons stated in my and Justice LEVIN's dissenting opinions in *Rowe,* see *id.* at 676-722. In this case, however, unlike *Rowe,* the Group B and Group C plaintiffs do not allege the existence of any express oral contractual term regarding the duration of the seven percent commission system, other than the vague and precatory promise that it would last "forever." This is a far cry from the express just-cause language alleged in *Rowe* and in *Toussaint v Blue Cross & Blue Shield of Michigan,* 408 Mich 579; 292 NW2d 880 (1980). For reasons noted by Justice BOYLE on pp 555-556 of her

[1] Plaintiffs have expressly abandoned before this Court any claim based on legitimate expectations. In their brief, plaintiffs explicitly state: "This cause of action rests on the 'just cause' portion of the *Toussaint* decision, not on the 'policy manual' portion." See *Toussaint v Blue Cross & Blue Shield of Michigan,* 408 Mich 579; 292 NW2d 880 (1980). Furthermore, former Justice ARCHER asked plaintiffs' counsel at oral argument how they could address the holding of *In re Certified Question, Bankey v Storer Broadcasting Co,* 432 Mich 438; 443 NW2d 112 (1989), that employers may, with adequate notice, unilaterally modify the expectations arising from policy manuals, and counsel responded that this case involves express contracts and express promises.

concurring opinion, ruling in favor of the plaintiffs in this case would require too great an inferential leap from the precatory "forever" term. On the record presented here, I agree that summary disposition was properly granted.

Because it is evident that no single opinion in this case will command a majority of the Court, and in view of the inordinate verbiage which this case has already produced, it appears that little purpose would be served by elaborating my views at any greater length.

I concur in the result.

The following opinion was filed with the Clerk of the Supreme Court on August 2, 1991, after the release of the opinion of the Court on July 31, 1991—REPORTER.

LEVIN, J. (*dissenting*). This is not an action claiming wrongful discharge.[1] None of the one hundred seventy-nine plaintiff sales representatives were discharged.[2] It is, rather, an ordinary action claiming breach of contract for failure to pay agreed-upon compensation for services rendered and to be rendered.

The sales representatives rely solely on an express promise, concededly made before or at the time they were hired, to pay "a 7% commission on

[1] The rule of construction in an employment discharge case is that employment is at will, unless the parties have otherwise agreed. See *Valentine v General American Credit, Inc,* 420 Mich 256, 259; 362 NW2d 628 (1984).

In focusing unduly on whether the Auto Club explicitly promised to pay renewal commissions for a particular period of time, the Auto Club, the circuit court, and now the majority in this Court, are copying the mode of analysis ordinarily followed in an action claiming wrongful discharge.

[2] They all continued to work for the Auto Club after 1977 as sales representatives, and were compensated for services rendered after 1977 pursuant to a system of compensation announced by the Auto Club at the same time that it announced it would no longer pay a seven percent commission on new sales or policy renewals.

new sales *and policy renewals.*" They do not assert that they may recover on the basis of an implied promise arising out of "legitimate expectations."

The same rules of interpretation and construction as apply to a long-term contract to buy and sell goods *or provide services*[3] should be applicable. Neither a buyer nor a seller of goods *or services* is ordinarily entitled to change the terms of the contract "to respond to changing economic circumstances . . . ."[4]

The question presented does not concern the scope of *Toussaint v Blue Cross & Blue Shield of Michigan,* 408 Mich 579; 292 NW2d 880 (1980).[5]

Before *Toussaint* was decided, courts were confronted with claims much like those here asserted, where the employer promised additional compensation, or an opportunity to earn additional compensation, and later asserted the "right" to, in effect, change the method of compensation, or deny

---

[3] See *Rowe v Montgomery Ward & Co, Inc,* 437 Mich 627, 695-699, ns 34-53; 473 NW2d 268 (1991), and accompanying text, concerning "as-long-as" oral and written contracts to provide services.

[4] RILEY, J., *ante,* p 532.

[5] To be sure, *Toussaint, supra,* pp 609-612, after reviewing "permanent" employment cases, deemed to be for an indefinite term with the result that the relationship was terminable at the will of either party, concluded that an employer's express agreement to terminate only for cause was enforceable although (i) the term of employment was for "as long as" the employee does the job and was not fixed at a definite number of months or years, and (ii) the contract of employment was unilateral, because the employee did not promise to remain in the employ of the employer for "as long as" the employee was able to do the job, and not bilateral. See Perritt, Employee Dismissal Law & Practice (2d ed), § 4.13, pp 200-202.

The signers of the lead opinion state in *Rowe*:

> [W]e do *not* suggest that a contract of employment is too indefinite to be enforced where the employee's consideration is the work performed in response to a unilateral offer. Nor do we depart from the concept that the presumption of employment at will is a rule of construction rather than a substantive limitation. [RILEY, J., p 638. Emphasis in original.]

the opportunity to earn additional compensation, after the employee had expended energy and had begun to earn the additional compensation.

At least as far back as the American Civil War, and more than 100 years before this Court decided *Toussaint,* courts have enforced promises made by employers when they sought to deprive an employee of the opportunity to earn expected compensation. Those promises have included agreements to pay compensation contingent on the happening of a certain event, and promises to pay "so long as" the employee performed certain work or remained on the job for a stated period. The courts have also enforced such promises in favor of commission salespersons.

In *Lake v Campbell,* 5 LTNS 582 (Eng, 1862), an employer promised a worker a bonus if he remained on the job until a certain date. The worker was discharged, without adequate cause, before that date. The court held for the worker, reasoning that the contract bound the employer to pay the bonus if the employee remained on the job *or was willing and able to do so.* Since it was the employer who had prevented the worker from fulfilling the conditions of the contract, the employer was liable for the bonus.[6]

Ninety years later—twenty-five years before *Toussaint*—the United States Court of Appeals for the Fifth Circuit reaffirmed this principle in *Coleman v Graybar Electric Co, Inc,* 195 F2d 374 (CA 5, 1952). Graybar had adopted an "additional compensation plan" that promised yearly bonuses to employees such as Coleman as "an incentive to continuous service with the company," on condition that the employee remain at work until the

---

[6] It could not be said that the bonus was for work already performed, since the promise to pay was conditioned on the employee being on the job until the specified date.

following April. Coleman, an at-will employee, was discharged forty-four days before the bonus vested on April 1. Graybar contended that since Coleman was not an employee on April 1, he had not fully performed and no bonus was due. The court disagreed:

> [A] construction of the language which would permit the employer to terminate the continuity of service without any cause and as a matter of arbitrary choice, or because of a desire to evade the payment of additional compensation would be entirely inconsistent with the purpose of the plan and, in the absence of clear and compelling language, should not be adopted.[7] [*Id.* at 377.]

The United States Court of Appeals for the Sixth Circuit, in *Lemmon v Cedar Point, Inc,* 406 F2d 94, 97 (CA 6, 1969), ruled—also before *Toussaint*—that only clear and express language would justify "the forfeiture of important rights almost earned by the rendering of substantial service," even in the face of written "at-will" provisions:

> *Coleman* is consistent with the principle that courts will strictly construe contractual provisions which authorize the forfeiture of important *rights almost earned by the rendering of substantial service.* Unless the language of the contract is so clear as to permit no other reasonable interpreta-

---

[7] The court continued:

In the absence of language clearly contemplating and providing for such a result, the parties should not be held to have intended such a consequence. To hold that they did, we must conclude that the parties, by the language quoted, stipulated that the employer reserved to itself the right to determine whether the additional compensation, conditionally promised it is true, should ever be received because such employer could refuse to comply with it merely by discharging the employee at its own whim. [*Id.* at 377.]

tion, such provisions will be construed to prevent arbitrary action in reliance on them. [*Id.* at 97. Emphasis added.]

The Oregon Supreme Court similarly ruled— also before *Toussaint*—in *Thompson v Burr*, 260 Or 329, 333; 490 P2d 157 (1971). In that case a yearly bonus was promised to an employee, "as 'an incentive to stay on the job.'" The written bonus agreement stated that the employer was under no obligation to pay the bonus unless the employee was on the job on April 1 of the following year. Nonetheless, the court ruled for the plaintiff:

> [I]t was an offer to make a bonus payment to any employee who "stayed on the job" and qualified for such payments, *so as to become a binding unilateral contract upon such an acceptance by such an employee and in consideration of his continued employment.* [*Id.* at 334. Emphasis added.][8]

---

[8] The court continued:

> There is ample authority to the effect that where the payment of a bonus is a matter of contract (as in this case), rather than a gratuity, such an agreement by an employer to pay a bonus to an employee may not be defeated by the employer by discharging the employee shortly before he has completed his eligibility for the bonus unless the discharge was for "good cause" and that if such an employee is discharged "without good cause" he is still entitled to payment of the bonus even if the employer did not act in bad faith. [*Id.* at 334-335.]

Professor Corbin tied all this together:

> The American Law Institute has approved the rule that when a promise is offered in exchange for specified action or forbearance the promise becomes binding and irrevocable as soon as *part of the requested performance* has been actually rendered or a proper tender of performance has been made. [1 Corbin, Contracts, § 63, p 262. Emphasis added.]

In another section of the treatise, Corbin said:

Speaking for the United States Court of Appeals for the Seventh Circuit, Judge Easterbrook wrote to provide a cause of action to a former at-will employee who claimed that he had been wrongfully deprived of the opportunity to earn profits on stock purchased through a compensation scheme designed to engender loyalty among the employees, when he resigned and sold the stock back to the company.[9] Company officials had not informed him of an impending buyout, which resulted in huge profits for stockholders. *Jordan v Duff & Phelps, Inc,* 815 F2d 429 (CA 7, 1987).

The court held that the company had a duty to tell Jordan that by leaving when he did he would lose a considerable sum of money. The court added that to hold otherwise would give the employer the power to, in effect, say to Jordan:

"even if you hadn't resigned, we would have fired you, the better to engross the profits of the merger

The case is quite different, however, when an employer has made a promise of compensation for service and the employee has *begun or has rendered such service* without having made any promise, express or implied, to begin or to continue it. In these cases, the employer is under an obligation (a legal duty), although the extent and character of that obligation are dependent on the terms of the promise that induced the service. [1A Corbin, Contracts, § 152, p 13. Emphasis added.]

A part performance of the bargained-for consideration, forming a part of the expected process of acceptance, is now held to make the offer irrevocable although the duty of the offeror is conditional upon completion by the offeree. The bonus cases just referred to are of this kind. *Although the bonus [read: renewal commission] is not fully earned until the service has continued for the full time, after a substantial part of the service has been rendered the offer of the bonus cannot be withdrawn without a breach of contract. [Id.,* § 153, p 20. Emphasis added.]

[9] The employment contract required Jordan to resell the stock to the company when he left.

for ourselves. So long, sucker."[10]

\* \* \*

> *One term implied in every written contract and
> therefore, we suppose, every unwritten one, is that
> neither party will try to take opportunistic advan-
> tage of the other. . . .* A firm may fire an em-
> ployee the day before his pension vests, or a sales-
> man the day before a large commission becomes
> payable. Cases of this sort may present difficult
> questions about the reasons for the decision (was it
> opportunism, or was it a decline in the employee's
> performance?). The difficulties of separating oppor-
> tunistic conduct from honest differences of opinion
> about an employee's performance on the job may
> lead firms and their employees to transact on
> terms that keep such disputes out of court—which
> employment at will usually does. But no one, not
> even Professor Epstein, doubts that an *avowedly
> opportunistic discharge* is a breach of contract,
> although the employment is at-will. [*Id.* at 437-438.
> Emphasis added.]

The court added that if the company had *dis-
charged* Jordan to deprive him of the stock profits
from the merger, rather than merely letting him
resign unknowingly, he would have had a cause of
action, *especially since the purpose of stock owner-
ship was to induce him to "stick around and work
well." Id.* at 438. (Emphasis added.)

Clearly, the Auto Club's change in the compen-
sation scheme was "avowedly opportunistic" even
though the Auto Club claimed it was needy.

Promises to pay commissions on policy renewals
have been enforced by courts in favor of at-will

---

[10] The court continued:

> This would have been permissible, under our colleague's
> interpretation, because Jordan was an employee at will and
> therefore could have been fired at any time, even the day
> before the merger, for any reason—including the desire to
> deprive Jordan of a share of the profits. [*Id.* at 437.]

employees, and are not an "extraordinary contractual promise."[11] Massachusetts' highest court held that an at-will employee working under a contract providing for the payment of commissions on new policies and renewals may not be deprived of "identifiable, reasonably anticipated future compensation, based on his past services, that he lost because of his discharge without cause." *Gram v Liberty Mutual Ins Co,* 384 Mass 659, 660; 429 NE2d 21 (1981).

Gram was an *at-will* insurance agent, discharged without cause, who claimed that he was discharged in bad faith and thereby deprived of renewal commissions and other compensation he would have earned if not fired. Although the Massachusetts court found "no basis for a reasonable inference that Liberty was motivated to discharge Gram by a desire to obtain the benefit of Gram's renewal commissions" and dismissed the bad-faith claim, it nonetheless said that "Gram lost reasonable ascertainable future compensation based on his past services" even though some "servicing" of clients might be necessary to obtain the renewal (*id.* at 669-671):

> Gram's contribution to Liberty's future income was not tenuous. *Liberty benefited from its discharge of Gram without cause, assuming that the normal course of the servicing of renewal business would cost less than the "forfeited" renewal commissions.* . . . Fair dealing, the other aspect of the obligation imposed on an employer, requires recognition of the agreed worth of such an employee's past service. [*Id.* at 672. Emphasis added.]

In *Hall v Farmers Ins Exchange,* 713 P2d 1027, 1029 (Okla, 1985), the Oklahoma Supreme Court affirmed a jury award of $225,000 to an insurance agent, representing the "reasonable amount of

[11] RILEY, J., *ante,* p 543.

future commissions from renewal premiums."[12]
Quoting *Wright v Fidelity & Deposit of Maryland,*
176 Okla 274, 277; 54 P2d 1084 (1936), the court
said:

"A contract consists not only of the agreements
which the parties have expressed in words, but
also of the obligations which are reasonably
implied. . . . *Every contract contains implied cov-
enants that neither party shall do anything that
will destroy or injure another party's right to
receive the fruits of the contract.*" [*Hall, supra* at
1029-1030. Emphasis added.]

The authors of the Restatement have succinctly
set down the long-standing rule that a principal
may not unfairly deprive his agent of the fruits of
that agent's own labor by a wrongful, unwarranted
resort to a clause in the agency contract which
provides for termination at will. [*Id.* at 1031.][13]

Here, of course, there is no dispute but that the
Auto Club changed the compensation plan *specifi-
cally* to deprive the sales representatives of seven
percent commissions on the renewal of old policies
and on future sales.

---

[12] Hall, an insurance agent who was an employee at will, had
received $42,000 in compensation from Farmers in 1978, $35,000 of
which was from renewal commissions. *Id.* at 1028.

[13] In affirming the verdict, the Oklahoma court added:

[The] evidence was limited to that which he had already sold
and which both he and Farmers assumed would be renewed at
a predictable, quantifiable rate during Hall's lifetime. There is
uncontroverted testimony that such renewal premiums consti-
tuted the bulk of Hall's income, and throughout his association
with Farmers he had anticipated this income because such was
the usual and *ordinary course of events* in the insurance
business and all this was well known [to] Farmers. [*Id.* Empha-
sis added.]

These are not isolated cases.[14] In *Tymshare, Inc v Covell*, 234 US App DC 46; 727 F2d 1145 (1984), the United States Court of Appeals for the District of Columbia Circuit, speaking through Judge Scalia, held that even though an employer had retained the right to retroactively change commission rates paid to salesmen for selling data processing services, an employee who charged that his commission rate was changed, and he was later discharged, because he was earning too much money, stated a cause of action. The court interpreted the "duty of good faith" to mean the implication into a contract of the obligation not to engage in a particular form of conduct, and to hold

---

[14] See *Emerick v Mutual Benefit Life Ins*, 756 SW2d 513 (Mo, 1988), where a discharged at-will agent was allowed to recover renewal commissions on policies he had sold during his tenure as general agent, and *Maddaloni v Western Massachusetts Bus Lines, Inc*, 386 Mass 877, 879, n 2; 438 NE2d 351 (1982), where an at-will employee who was employed to procure charter rights from the ICC for his company recovered five percent "of the total Special and Charter revenue income . . . paid . . . on the 15th day of each month," whether he had done anything to procure the customers or not.

See also *RLM Associates v Carter Mfg Corp*, 356 Mass 718; 248 NE2d 646 (1969) (the employer may not terminate the employment of an employee to avoid paying commissions); *Tahir ERK v Glenn L Martin Co*, 116 F2d 865 (CA 4, 1941) (the defendant may not terminate the employment of an agent to deprive him of commissions); *Fortune v Nat'l Cash Register Co*, 373 Mass 96; 364 NE2d 1251 (1977) (covenant of good faith and fair dealing requires that when a principal acts to deprive an agent of compensation by terminating an at-will contract when the agent is on the brink of successfully completing a sale that would result in a substantial commission, the salesman is entitled to recover such compensation); *Dowty v Blue Cross of LA*, 410 So 2d 332 (La App, 1982) (continued employment is not a prerequisite to the recovery of renewal commissions).

The Supreme Court of Alaska affirmed an award of future profits promised to an employee after finding that the employee was discharged to deprive him of those profits. *Mitford v Lasala*, 666 P2d 1000 (Alas, 1983).

In *Baum Associates, Inc v Society Brand Hat Co*, 477 F2d 255, 259 (CA 8, 1973), the plaintiff alleged that he was promised commissions *in perpetuity* should he be successful in procuring purchasers of his employer's trousers. He did, and was later discharged. The court found "relatively minor" efforts were required to service clients once procured, and the plaintiff recovered commissions from orders received from old customers after he was discharged.

the contracting parties to their reasonable expectations.

The issue then became whether it was reasonable to interpret the contract to allow the employer to change commission rates for any reason at all, or to infer a limitation on that right. *The court found that it was unreasonable to suppose that the parties intended to allow the employer to use its power to change commission rates for the purpose of depriving a sales representative of reasonably contemplated compensation, and remanded the case for trial to provide the plaintiff the opportunity to prove his allegations.* The rates could be adjusted only for an "unexpectedly high volume of sales not attributable to the special efforts of the sales representative . . . ." *Id.* at 57.

In *Leonard v Louisiana Health Service & Indemnity Co,* 505 So 2d 173, 176 (La App, 1987), the plaintiffs were employed to sell Blue Cross insurance policies. They were paid a cash "enrollment fee," a five percent commission on the sale of a new policy, and a five percent commission on renewals for the first two years the policy was in force. Blue Cross attempted to change the compensation scheme by circulating a "Subject Memorandum." Thereafter, the memorandum stated, it would pay the entire commission when the new policy was sold, and nothing for renewals. The plaintiffs succeeded in obtaining a five percent commission on renewals:

> Of course, the provisions of the Subject Memorandum shall govern their rights to renewal commissions with respect to policies they caused to be issued in the period extending until the earlier of termination of association with Blue Cross or termination of the Subject Memorandum. In elaboration of this point, *the Subject Memorandum shall not be construed so as to have any effect preclud-*

*ing Descant and Ordes from recovering renewal commissions payable with respect to policies they caused to be issued prior to January 1, 1979.* [Emphasis added.][15]

I

The Auto Club Insurance Association entered into oral unilateral contracts[16] of employment with the one hundred seventy-nine plaintiff sales representatives pursuant to which the Auto Club agreed —as acknowledged in affidavits filed by the Auto Club in this action[17]—to pay the sales representatives "a 7% commission on new sales and *policy renewals.*"

Each of the one hundred seventy-nine sales representatives worked for a number of years for the Auto Club on the basis of the oral contracts. Well over two-thirds of them worked on the basis of those contracts for over ten years, some for over twenty years.

The Auto Club paid sales representatives a seven percent commission on renewals as well as

---

[15] The case might be distinguished on the basis that the court found that the plaintiffs had no responsibility to obtain a renewal.

[16] The contracts were unilateral because the offer of the Auto Club to a potential sales representative looked for acceptance by performance, not a promise to perform. Where there is an exchange of promises, the contract is bilateral.

[17] In connection with the motions for summary disposition, the Auto Club filed the affidavits of its field manager-administration and field manager-general agents, who asserted that they had been employed by the Auto Club for over twenty-five years and had been personally responsible for interviewing and hiring many commissioned sales representatives for the Auto Club. They stated that in their interviews before 1978 of potential commissioned sales representatives, they informed the interviewees of the Auto Club's "then-existing policy for compensating commissioned sales representatives. Specifically, I advised interviewees that the Automobile Club paid *a 7% commission on new sales and policy renewals.*" (Emphasis added.) The affiants continued that they did not represent to the interviewees that the commission paid could never be changed or would never change.

seven percent on new policies for over twenty-five years, until early 1978. At the end of 1977, the Auto Club announced that, beginning sometime in early 1978, it would no longer compensate sales representatives on a commission basis, and would not pay a commission of seven percent either on new sales or on policy renewals of old sales.[18] The sales representatives commenced this action in the circuit court.

The sales representatives originally contended that the Auto Club was obliged to pay a seven percent commission on new sales after 1977, as well as on policy renewals. They no longer contend that the Auto Club was obliged to pay a seven percent commission either on new sales or on renewals of sales made after 1977. They continue to contend, however, that the Auto Club breached its contracts with them when it refused to pay a seven percent commission on renewals after 1977 of policies first written before 1978.[19]

---

[18] A majority of the sales representatives voted to organize a labor union to represent their interests. The union and the Auto Club did not succeed in agreeing on a collective bargaining agreement. Nor was the union successful in pursuing, before the National Labor Relations Board, a charge that the Auto Club had engaged in an unfair labor practice. The union was decertified. See *Bullock v Automobile Club of Michigan,* 432 Mich 472; 444 NW2d 114 (1989).

[19] The Auto Club contends that, by continuing to work for the Auto Club and by accepting compensation for services rendered after 1977 pursuant to the new system of compensation, the sales representatives agreed to a modification of, and to release their rights under, any earlier contracts to pay a seven percent commission on policy renewals of old sales. When the Auto Club announced the new compensation system, it did not, however, offer to modify any earlier contract. It asserted rather, as it does now, that there were no preëxisting contracts to be, or that could be, modified.

In all events, the sales representatives mitigated their damages by continuing to work for the Auto Club. The Auto Club was also advantaged by retaining the services of an experienced sales force.

In *Farrell v Automobile Club of Michigan (On Remand),* 187 Mich App 220, 228; 466 NW2d 298 (1991), the Automobile Club argued "that its imposition of a policy requiring adherence to minimum sales levels constituted an offer to modify any contrary express agreement

II

One hundred thirty-nine of the one hundred seventy-nine sales representatives, identified in the lead opinion as Group A, conceded on deposition that they could not recall whether the Auto Club *explicitly* promised that the seven percent commission would be paid on renewals for any particular period of time or duration. They, nevertheless, contend that the express promise to pay a seven percent commission on policy renewals means renewals written while they remained in the employ of the Auto Club.

The one hundred thirty-nine sales representatives, and the other forty as well, assert that their interpretation of the express promise—concededly made by the Auto Club—is supported by the course of performance and evidence adduced in response to interrogatories propounded by the Auto Club, and additional evidence that would be adduced at trial if this Court would permit their claims to be tried on the merits.

A

The lead opinion, written by Justice RILEY and signed by Justices BRICKLEY and GRIFFIN, holds that the one hundred thirty-nine Group A sales

alleged by plaintiff and that acceptance of this offer was manifested where plaintiff 'clearly continued employment thereafter, without protest.' " The Court of Appeals rejected this argument, concluding from its review of the record that "a *sufficient factual dispute* existed concerning whether plaintiff's continued employment was 'without protest.' Moreover, we agree with plaintiff that acceptance cannot be presumed from the mere fact of continued employment; otherwise, how would such an offer ever be rejected, absent one leaving employment? Rather, to the extent defendant's policy change constituted an offer to modify contrary terms of a prior express agreement, the question whether plaintiff accepted such an offer must be determined from the acts and circumstances of the parties, including their written or spoken words or by other acts or conduct." (Emphasis added.)

representatives, who do not claim that they were
told at the time of hiring that the seven percent
commission on renewals would continue to be paid
for any particular duration, may not maintain an
action "because no express promises of perma-
nency were made" to them.[20]

The Chief Justice agrees that "there is simply
no basis in this case for the Group A plaintiffs'
express oral contract theory," apparently because
these one hundred thirty-nine sales representa-
tives "have no memory that they were promised
seven-percent commissions 'forever,' and *no evi-
dence on the record* supports such a promise."[21]
Justice Boyle states that the Group A sales repre-
sentatives' "proofs are insufficient to support the
*inference of a just-cause contract* or an *enforceable
promise not to change the payment plan. The
circumstances* identified as guidelines with regard
to the intent to create a just-cause contract in
*Rowe v Montgomery Ward & Co, Inc,* 437 Mich
627; 473 NW2d 268 (1991), are not present." (Em-
phasis added.)[22]

B

Twenty sales representatives, comprising Group
B, claimed on deposition that they were told *"be-
fore or at the time of hiring"* that they would
receive "a *7% renewal* commission 'for as long as
they were employed by the Auto Club,' or 'forever'
or 'always' or words to that effect." The lead

[20] The opinion asserts that, therefore, "any contractual rights to
that effect had to spring from the 'legitimate expectations' leg of
*Toussaint v Blue Cross & Blue Shield of Michigan,* 408 Mich 579, 598;
292 NW2d 880 (1980)." Riley, J., *ante,* pp 528-529.

The lead opinion also argues that the right to renewal commissions
does not rest upon the sale of the original policy. *Id.,* p 530.

[21] The quoted words are from the lead opinion, n 3. See Cavanagh,
C.J., *ante,* p 559.

[22] Boyle, J., *ante,* pp 549-550.

opinion holds that such a promise is unenforceable "because it was not possible for renewal commissions to *accrue* until after the first year" and, hence, the "agreement with regard to renewals was not capable of performance within [the] one year" statute of frauds. (Emphasis added.)[23]

The Chief Justice and Justice BOYLE do not join in the statute of frauds[24] analysis, and join in reversal of the Court of Appeals on the basis that the sales representatives provided insufficient proofs of a promise to pay a seven percent commission on each renewal they wrote during their employment.

C

Twenty sales representatives, comprising Group c, claimed on deposition that they were told at some point *"after they were hired"* they would receive "a 7% renewal commission 'for as long as they were employed by the Auto Club,' or 'forever,' or 'always,' or words to that effect." The signers of the lead opinion conclude that the claimed commitment is unenforceable because "we find that the circumstances demonstrate that *no mutual assent* was reached on the permanency of the commission plan with respect to renewals."[25] (Emphasis added.)

---

[23] RILEY, J., *ante,* pp 532-533, 539.

[24] The one-year statute of frauds reads:

In the following cases an agreement, contract or promise shall be void, unless that agreement, contract, or promise, or a note or memorandum thereof is in writing and signed by the party to be charged therewith, or by a person authorized by him:

(a) An agreement that, by its terms, is not to be performed within 1 year from the making thereof. [MCL 566.132; MSA 26.922.]

[25] RILEY, J., *ante,* pp 542, 549.

The Chief Justice agrees with that conclusion, stating that "ruling in favor of the plaintiffs in this case would require too great an inferential leap from the precatory 'forever' term. On the record presented here, I agree that summary disposition was properly granted."[26] Justice Boyle, adverting to the analysis and approach set forth in her concurrence in *Rowe*, concludes that the sales representatives have not alleged facts or circumstances sufficient to permit a factfinder to conclude that the Auto Club's offer of specific compensation "would continue for the duration of employment (or beyond)" or that it "was making a commitment amounting to a promise of a permanent renewal compensation plan."[27]

**D**

I agree with Justice Boyle that the central issue in this case is doctrinally the same as that in *Rowe*. The issue is whether Mary Rowe, in *Rowe*, and the sales representatives, in the instant case, may maintain actions for breach of an *express* contract.

I further agree with Justice Boyle that resolution of this issue depends on the facts and circumstances of the particular case.

For reasons set forth in dissent in *Rowe*, and in this dissenting opinion, I believe that the signers of the lead and concurring opinions employ an incorrect standard and approach, and commit other errors in analysis and assessment of the summary disposition record in this case.

**III**

The signers of the lead and concurring opinions

---

[26] Cavanagh, C.J., *ante*, p 560.

[27] Boyle, J., *ante*, p 552.

begin with an *incorrect description* of the testimony of the forty sales representatives who recalled being told or informed of a durational term for the promise to pay a seven percent commission on policy renewals.

They proceed on the basis of the *incorrect assumption* that the promise to pay a seven percent commission on policy renewals did not, as a matter of law, express a durational term. The signers of the lead opinion *misstate the issue.*

Further, they decide this case on the basis of an *issue not briefed,* the sufficiency of the evidence. Moreover, although the motion for summary disposition did not *"specifically identify,"* as provided in the court rule, as an issue the sufficiency of the evidence, they affirm the trial court's order granting summary disposition on that basis.

A

The *incorrect description* is that the forty sales representatives testified to a "vague and precatory promise" that "the seven percent commission system" "would last 'forever.' "[28]

The affidavit filed by the attorney for the Auto Club in support of its motion for summary disposition did not indicate whether all forty—or only one, or more than one—sales representative actually used the word "forever" or "always" to describe the durational term of the promise to pay renewal commissions. Because the depositions themselves were not filed, this Court is unable to determine the context in which the words "forever" or "always" were used. The signers of the lead and concurring opinions, nevertheless, state

[28] CAVANAGH, C.J., *ante,* p 559; BOYLE, J., *ante,* p 556; RILEY, J., *ante,* pp 524, 527, 532, 539, 542, 548.

that *all forty sales representatives* claim the "defendant made extraordinary contractual promises that the commission system would be in place 'forever.' "[29]

*An even-handed summarization of the attorney's affidavit*[30] *would recognize that perhaps only one, or only a handful, of the sales representatives may have used the word "forever" to describe the durational term.*

It was the obligation of the Auto Club to state carefully in the affidavit relied on to support its motion for summary disposition the deposition testimony of the sales representatives. It is most unlikely that all forty sales representatives said "for as long as they were employed by the Auto Club," and *also* "forever," and *also* "always."

This Court cannot, on the basis of this affidavit, properly portray these forty plaintiffs' deposition testimony as making a claim that they have not made, a claim that possibly only one sales representative may have expressed on deposition, that the promise was to pay on renewals "forever."

---

[29] RILEY, J., *ante,* p 543. See n 28.

[30] Contrary to the court rule (MCR 2.302[H]), the Auto Club did not file the depositions of the sales representatives with the circuit court when it filed a motion for summary disposition based on the deposition testimony; I acknowledge that the Auto Club offered to do so if requested.

The Auto Club filed, rather, an affidavit prepared by an attorney for the Auto Club, stating that on review of the depositions of the one hundred seventy-nine sales representatives, it appeared that one hundred thirty-nine did not recall that they were told or informed that they would receive a seven percent commission "for as long as they were employed by the Auto Club," or "forever," or "always," or "any words to that effect." Seven, according to the affidavit, "gave contradictory and/or unclear answers," whether they were so informed, fourteen testified that they were so told before they were hired, and twenty testified that they were so told after they were hired.

The trial court and the majority have dubbed the one hundred thirty-nine sales representatives as Group A, the seven and fourteen as Group B, and the twenty as Group C.

B

The *incorrect assumption* is that the Auto Club's promise to pay "a 7% commission on new sales and policy renewals" did not, as a matter of law, express a durational term[31] for the Auto Club's promise to pay a seven percent commission on "policy renewals."

Contrary to the assumption made by the signers of the lead and concurring opinions, the words "policy renewals" may reasonably be interpreted by the promisee, the sales representative,[32] as implicitly stating a durational term, namely, for as long as the Auto Club and the customer choose to renew the policy.

The policy renewal time frame for a particular customer is readily determinable. The period during which the Auto Club may choose to extend an offer to renew a policy, and the customer may choose to accept the offer, is the time frame for that renewal. The renewal time frame for a customer is for however long the Auto Club and the customer continue to do business on a renewal basis.

Because the trier of fact could, absent other evidence, appropriately find that a promise to pay commissions on "policy renewals" might be reasonably interpreted and understood by the promisee as having that meaning,[33] it is not, and should not be, determinative whether the sales representatives recall being told that renewal commissions would be paid on policy renewals "for as long as they were employed by the Auto Club," or "forever," or "always."

I ask the majority

---

[31] RILEY, J., *ante,* p 528. BOYLE, J., *ante,* p 550.

[32] See n 53 and accompanying text.

[33] *Id.*

—What does the term "policy renewals" mean if not "an insurance policy issued when a customer accepts an insurer's offer to renew the policy"?

—What does a promise to pay a seven percent commission on policy renewals mean—absent other evidence, such as a course of performance limiting the duration to the time that the sales representative remains in the employ—if not "a promise to pay a seven percent commission on policy renewals for as long as the insurer and the customer choose to renew an earlier policy"?

The sales representatives do not claim—as the majority incorrectly states[34]—that a seven percent commission would be payable "forever" or that a seven percent commission would be payable on a policy renewal written after a sales representative left the employ of the Auto Club.

The sales representatives recognize that they were expected to continue to provide service in respect to renewals and, accordingly, that no renewal commissions would be payable after a sales representative left the employ of the Auto Club. It further appears that the Auto Club—which paid a seven percent commission on policy renewals for over twenty-five years—did not pay any commission on policy renewals written after a sales representative left the employ of the Auto Club.

The trier of fact could reasonably find that a promise to pay a renewal commission for "as long as" the insurer and the customer choose to renew the policy and the sales representative remains in the employ of the insurer, states a durational term. The contract formed when an offer making such a promise is accepted provides a means of determining the period of time during which the insurer is obliged to pay renewal commissions,

[34] See part III(A).

namely, the period during which the insurer offers to renew, the customer accepts the offer, and—on the basis of the other testimonial evidence and the course of performance—the sales representative remains in the employ of the insurer.

The duration of the contract is, therefore, determinable, and sufficiently definite, although it is uncertain how long the insurer will offer to renew, the customer will choose to renew, and the sales representative will remain in the employ of the insurer.

C

The lead opinion *misstates the issue,* and in so doing builds on the incorrect assumption that there is not a durational term for the conceded promise to pay a seven percent commission on policy renewals.

The signers of the lead opinion state that "because no express promises of permanency[35] were made to [the Group A] plaintiffs, any contractual rights to that effect had to spring from the 'legitimate expectations' leg of *Toussaint* . . . ." They then state that the "threshold inquiry" is "whether to extend the 'legitimate expectations' leg of *Toussaint* beyond wrongful discharge disputes to cover an employer's compensation policy. We choose not to extend the 'legitimate expectations' cause of action to this case."[36]

The Chief Justice and Justice BOYLE have declined to address the " 'legitimate expectations' leg of *Toussaint,*" recognizing that the claims of the

---

[35] Elsewhere in the opinion, they opine that a promise of permanency is not credible. RILEY, J., *ante,* p 528. BOYLE, J., *ante,* pp 552 and 556.

[36] RILEY, J., *ante,* p 529.

sales representatives are based on an express, not an implied, promise.[37]

Express promises, as well as statements in an employees' manual, generally give rise to expectations—legitimate expectations that the promise will be performed and kept. The source of the legitimate expectations, in the instant case, is an express promise.

The signers of the lead opinion confuse interpretation and implication. The central issue in this case is interpretation.

Interpretation of an express promise does not convert the express promise into an implied promise.[38] In this case, there was an express promise concerning compensation and, in particular, concerning compensation on policy renewals. The central issue presented concerns the interpretation and meaning of the express promise to pay seven percent on policy renewals.[39]

D

A premise of the majority's conclusion is that because the Auto Club's promise concerns compensation, and the resulting contract is an employment contract rather than, say, a contract for the sale of goods, the employer will be deemed, at least where the contract of employment is *oral,* to have reserved the right to change the compensation unless the employer explicitly stated, when entering into an oral contract of employment, that it does *not* reserve the right to do so.

---

[37] Cavanagh, C.J., *ante,* pp 558-559. Boyle, J., *ante,* p 550, n 4.

[38] An implied promise is one that arises separate and apart from an express promise, such as the implied promise of an employer to pay a day worker, of a patient to pay a physician, of a client to pay a lawyer, for services rendered on request without regard to whether there was any discussion of compensation.

[39] See part IV *infra.*

The majority does not cite any authority for this proposition, or explain when it became a feature of the law of contracts that a promise is not enforceable unless the promisor not only promises to act in a certain manner, but additionally promises that he will not unilaterally change or renege on the commitment.[40]

Management does not, even having in mind "the needed flexibility of businesses to change their policies to respond to changing economic circumstances,"[41] have the prerogative of reneging on a contract, whether oral or written.

The rules of contract construction are the same for written and oral contracts. The judicial preference for writings is understandable. They are tidier and, when well thought through and drafted, may make *our* task easier. The plethora of litigation over the meaning of writings suggests, however, that the course of performance, like circumstantial evidence, is sometimes the bearer of truth.

Be that as it may, if the Auto Club had promised *in writing* that it would pay "a 7% commission on new sales and policy renewals," it might be clear to the majority, as it is to me, that unless the Auto Club expressly reserved the right to

---

[40] In *Rowe,* I review the decisions of this Court and of courts in other jurisdictions, including United States Courts of Appeal, the highest courts of New York, Massachusetts, California, Minnesota, Texas, and Wisconsin, and the United States Supreme Court, in which "as long as" contracts were found or deemed to express a durational term. *Rowe, supra,* part II(F), n 34. As I observe in *Rowe,* there is no suggestion in any of the cases "that a promisor would be permitted to terminate promissory obligations under an exclusive distribution, requirements, employment, or other 'as long as' contract except for failure of performance by the promisee." *Rowe, supra,* following n 70 (p 702).

[41] RILEY, J., *ante,* p 532.

I recognize that economic necessity may justify a reduction in force, and constitute "cause" for dismissal or layoff. *McCart v J Walter Thompson USA, Inc,* 437 Mich 109; 469 NW2d 284 (1991); *Bullock,* n 18 *supra; Woolley v Hoffmann-LaRoche, Inc,* 99 NJ 284; 491 A2d 1257 (1985), modified 101 NJ 10; 499 A2d 515 (1985).

unilaterally terminate the obligation to pay a seven percent commission on renewal of policies written before the announcement of a change in compensation, the Auto Club was not at liberty unilaterally to modify the compensation payable on renewals of policies written before the announcement of the change in *future* compensation.

E

This Court rules against the claims of the sales representatives in part because of an asserted insufficiency in their proofs.[42] The Auto Club, did not, however, in its motion for summary disposition, "specifically identify" as an "issue," as provided by the court rule,[43] that the sales representatives could not proffer at trial sufficient evidence in support of their pleaded allegation that they were promised that a seven percent commission would be paid "on each renewal that they wrote during their entire employment."

---

[42] With regard to members of Group C, we find that the *circumstances* demonstrate that no mutual assent was reached on the permanency of the commission plan with respect to renewals. [RILEY, J., *ante,* p 549. Emphasis added.]

Plaintiffs' *proofs are insufficient* to support the inference of a just-cause contract or an enforceable promise not to change the payment plan. [BOYLE, J., *ante,* p 549. Emphasis added.]

On the *record* presented here, I agree that summary disposition was properly granted. [CAVANAGH, C.J., *ante,* p 560. Emphasis added.]

[43] Rule 2.116 Summary Disposition

* * *

(G) Affidavits; Hearing.

* * *

(4) A motion under subrule (C)(10) *must* specifically identify the issues as to which the moving party believes there is no genuine issue as to any material fact. [Emphasis added.]

The motion for summary disposition asserted, rather, that one hundred thirty-nine of the one hundred seventy-nine sales representatives had stated on deposition that they had not been told or informed by the Auto Club that they would receive a seven percent renewal commission " 'for as long as they were employed by the Auto Club,' " or " 'forever,' " or " 'always,' " or " 'any words to that effect.' " Seven, it was asserted, "gave contradictory and/or unclear answers," whether they were so informed, fourteen testified that they were so told before they were hired, and twenty testified that they were so told after they were hired.

A court may properly grant summary disposition, on the basis that there is no genuine issue as to any material fact, only where there has been "a complete failure of proof concerning an *essential element* of the nonmoving party's case."[44]

Establishing that the sales representatives had been " '*told, or otherwise informed* by the Auto Club' " that the seven percent renewal commission would be paid either " 'for as long as they were employed by the Auto Club,' " or " 'forever,' " or " 'always,' " or " 'any words to that effect,' " *was not an "essential element"* of the sales representatives' case. The sales representatives, whether in Group A, B or C, could establish the alleged durational term—"each renewal that they wrote during their *entire employment*"—by other evidence such as the testimony of other sales representatives or persons, such as present or former employees of the Auto Club, or the course of performance.

That the Auto Club did not "specifically identify" the sufficiency of the evidence in its motion for summary disposition, is borne out by an exami-

[44] *Celotex Corp v Catrett,* 477 US 317, 323; 106 S Ct 2548; 91 L Ed 2d 265 (1986). (Emphasis added.)

nation of the brief filed by the Auto Club in this Court, which does not argue the sufficiency of the evidence.

The brief,[45] following the pattern of the motion for summary disposition, argued, rather, that the claim of the Group A sales representatives must fail because they had acknowledged they had not been told or informed of a durational term, and the claim of the Group B sales representatives must fail, not because of insufficiency in the evidence of a promised durational term, but rather because enforcement of the promise was barred by the statute of frauds, and the claim of the Group C sales representatives must fail, not because of insufficiency in the evidence of a promised durational term, but, rather, because the Group C sales representatives claimed that they were told or informed of the durational term after they were hired, and there was a "lack of any consideration beyond the pre-existing cooperation and loyalty those plaintiffs had already committed to perform."

A majority of the Court does not find against the claims of the one hundred thirty-nine representatives comprising Group A *solely* on the basis that they were not so told and informed. Nor is there a majority for finding against the claims of the Group B sales representatives on the basis that their claim is barred by the statute of frauds, or for finding against the claims of the Group C sales representatives on the basis of lack of consideration.

None of the justices find against the claims of the Group C sales representatives solely on the

[45] Attached as an appendix is the summary of the Auto Club's argument set forth in its brief filed with this Court. Included in that summary are references to the four points covered in the Auto Club's motion for summary disposition.

basis sought by the Auto Club, either in its motion for summary disposition or in its brief filed in this Court. Indeed, none of the justices rule against the claims of the Group C sales representatives solely on the basis of lack of consideration.

All the justices comprising the majority rule against the claims of the Group C sales representatives on the basis that there is not sufficient evidence to support their claim that they were promised a seven percent commission on policy renewals "that they wrote during their entire employment." Lack of "special consideration" for the asserted post-hiring promise was only one of the factors, not the sole factor considered by the majority. The majority rule, in effect, and correctly so, that lack of consideration or special consideration would not alone justify dismissal of a claim relying on an express promise, even one made after hiring.

The fourth and fifth votes for reversal of the Court of Appeals, those of the Chief Justice and Justice BOYLE, reject the claims of all the sales representatives on the basis of insufficiency of the evidence without regard to whether they are in Group A, B, or C, an issue that the Auto Club neither "specifically identified" in its motion for summary disposition nor argued in its brief in this Court.

1

In *McCart v J Walter Thompson USA, Inc,* 437 Mich 109, 116; 469 NW2d 284 (1991), this Court ruled in favor of an employer, in part because the plaintiff had "failed to carry his burden under MCR 2.116(G)(4)," providing that when a motion is filed asserting that there is no genuine issue as to any material fact, "an adverse party may not rest

upon the mere allegations or denials of his or her pleading, but must, by affidavits or as otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial."

The same MCR 2.116(G)(4) further provides, however, that "[a] *motion* [for summary disposition asserting that there is no genuine issue as to any material fact] *must specifically identify the issues* as to which the moving party believes there is no genuine issue as to any material fact." (Emphasis added.)

The Auto Club's motion was carefully crafted to advert only to those "factual" matters about which there could be no dispute. The motion repeated what the sales representatives had stated on deposition in response to only one inquiry: whether they had been "told or informed" about a durational term for the promise to pay a seven percent commission on renewals, and, if so, whether this was at the time of hiring or thereafter. The Auto Club's motion did not assert the absence of a genuine issue of material fact concerning any of the following formulations or fact finding set forth in the lead opinion:

—whether "the *circumstances* demonstrate that [there was] no *mutual assent* . . . on the permanency of the commission plan with respect to renewals" (RILEY, J., *ante,* p 549, emphasis added);

—whether the Auto Club "*intended* to bargain away its right to change the method of compensation" (*id.,* p 543, emphasis added);

—whether the statements to the class C plaintiffs were "*intended* to bolster morale and enhance employee pride in the company," or "*merely* stated opinions of management representatives that the company would not change its commission rate," or "were *designed* as assurances by management

that in the foreseeable future, there were no rate changes planned" (*id.,* p 543, emphasis added);

—whether the statements to the class C plaintiffs were *"comments"* that were *"isolated"* (*id.,* p 544, emphasis added);

—whether "[*any*]*thing was offered by* plaintiffs in addition to their continued employment that would *reasonably prompt* defendant to make such *extraordinary* contractual commitments" (*id.,* emphasis added);

—whether the one hundred seventy-nine sales representatives were *informed before they were promised* a seven percent commission on policy renewals of "the changes in the compensation and commission system with regard to sales representatives in the years leading up to the employment of plaintiffs" described on p 545 of the lead opinion and, if not, which of the one hundred seventy-nine sales representatives, if any, were so informed before they were promised a seven percent commission on policy renewals;

—whether "*significant* decreases in the reserves of the business *threatened* availability of insurance funds" (*id.,* p 547, emphasis added);[46]

—whether "the *value of the services* [the sales representatives] performed exceeded the compensation received in return" (*id.* emphasis added);

—*whether "the renewals were a form of deferred compensation which vested* at the time of the original sale" (*id.,* p 548), or whether "*representations* [*were*] *made* to plaintiffs with regard to deferred compensation" (*id.,* p 530), or

---

[46] While an affidavit was filed asserting that the change in the compensation system had been recommended by the accountants for the Auto Club, economic necessity was not one of the four stated reasons specifically identified in the Auto Club's motion for summary disposition. See Appendix.

whether it was *agreed* that "renewals are a form of deferred compensation" (*id.,* p 548, emphasis added);

—whether the "actions of the company" were in *"good faith"* (*id.,* emphasis added);

—whether the compensation paid to the sales representatives was *"in line with the services"* (*id.,* emphasis added);

—whether the Auto Club *"confiscated and diminished* the value of their books of business" (*id.,* emphasis added);

—whether the Auto Club "adjusted compensation *so that no employees would experience a reduction* in income unless their volume of business fell" (*id.,* p 526, emphasis added).

Nor did the Auto Club's motion assert the absence of a genuine issue of material fact concerning any of the following formulations and fact finding set forth in Justice BOYLE's concurring opinion:

—Whether the sales representatives' *"proofs"* were sufficient "to support the inference of a just-cause contract or an enforceable promise not to change the payment plan." BOYLE, J., *ante,* p 549. (Emphasis added.)

—Whether the sales representatives would be able to produce at trial "submissions, suggestions, argument or . . . *proof* that the employer's statements, interpreted in the light of trade usage or course of performance, permit the conclusion that the factfinder could draw an inference of a durational term for the method of compensation." *Id.,* p 550. (Emphasis added.)

—Whether "[a]ssuming, arguendo, that a termination for-cause employment term would support the inference of a durational term for the method of compensation, [the sales representatives would,

at a trial, be able to provide a] *record* to infer other than employment-at-will contracts [or provide] ground [for] question[ing] the employer's good faith." *Id.,* pp 550-551. (Emphasis added.)

—Whether "[p]laintiffs *simply* suggest that they were told that if they worked hard in the beginning of their careers they would reap the benefits." *Id.,* p 551. (Emphasis added.)

—Whether "the *facts alleged are* [ ]sufficient to permit a factfinder to conclude that the employer was making a commitment amounting to a promise of a permanent renewal compensation plan." *Id.,* p 552. (Emphasis added.)

—Whether "renewals of old sales were *intended* to be a form of deferred compensation, they would be payable regardless of termination." *Id.,* p 553. (Emphasis added.)

—Whether any *representations* were made to the sales representatives "with regard to 'deferred compensation.' " *Id.,* p 555.

—Whether there was a "*trade usage* to supply a term in this case . . . ." *Id.,* p 554. (Emphasis added.)[47]

—Whether the *facts and circumstances* provide "meaning" for the "term of art 'book of business.' " *Id.*

—Whether "the defendant *retained the right* to discharge these employees when it hired them," at will, or whether it *agreed* to discharge them only for "just cause." *Id.,* p 556. (Emphasis added.)

—Whether there is an "*objective manifestation* that the employer was making a commitment that amounted to a promise nor a reasonably certain

---

[47] On the *record,* briefs, and argument submitted here, it is entirely speculative that trade usage or other rules of construction assist in supplying omitted durational terms or as bearing on the parties' intent. [*Id.,* p 555. Emphasis added.]

basis for giving an appropriate remedy." *Id.* (Emphasis added.)

—Whether there is an "*objective indication* that overcomes the presumption that there was no durational term for compensation with respect to future renewals." *Id.* (Emphasis added.)

2

The majority, in so assessing the "context and circumstances" without any record having been made, has clearly departed from the norms of decision making for either a trial or an appellate court.

3

Dismissal of the sales representatives' claims cannot properly be justified on the basis that they concede that renewal commissions are payable only on renewals written while they remained in the employ of the Auto Club, and that their employment could be terminated at any time because they were *employees at will.*

The lead opinion does not advert to whether the oral employment contracts with the sales representatives provided that they could be dismissed at the will of the Auto Club or only for just cause. Justice BOYLE proceeds on the assumption that the contracts provided for employment at will and did not include a term regarding termination only for just cause.[48]

---

[48] Plaintiffs' proofs are insufficient to support the inference of a *just-cause* contract or an enforceable promise not to change the payment plan. The circumstances identified as guidelines with regard to the intent to create a *just-cause* contract in *Rowe v Montgomery Ward & Co, Inc,* 437 Mich 627; 473 NW2d 268 (1991), are not present. [*Id.,* pp 549-550. Emphasis added.]

The eighth amended complaint alleged, however, that the contracts of employment with the sales representatives provided that they could be dismissed only for just cause:

> 7. Said plaintiffs were specifically promised, as part of their employment contract, that they would not be reprimanded, suspended or fired without *just cause.* The plaintiffs herein were told, promised and guaranteed at the time of their hiring and thereafter that they would only be fired for mishandling defendant's money or for drunkenness. [Emphasis added.]

The Auto Club's motion for summary disposition did not seek to controvert the allegation of a just-cause contract, or assert that there was no factual support for the claim of a just-cause contract.

The Auto Club asserted, rather, in the accompanying memorandum of law, as the last of four specifically identified reasons, that *"even if* the claims of all of the plaintiffs are treated as arising under some integrated 'just cause' employment contract, their claims *are barred by collateral estoppel."* The memorandum further asserted that the NLRB finding[49] that the change in the compensation system was motivated by legitimate business considerations *collaterally estopped* the sales representatives from asserting their claims. Later in the memorandum of law, the Auto Club again expressly avoided controverting, on a factual basis, the allegation in the amended complaint that the

[T]here is no basis on this record to infer other than employment-*at-will* contracts and no ground to question the employer's good faith. [*Id.,* pp 550-551. Emphasis added.]

. . . in the context of an *employment-at-will relationship* . . . . [*Id.,* p 551. Emphasis added.]

[49] See n 18.

employment was not at will but, rather, was governed by just-cause contracts.[50]

The sales representatives were obliged to set forth, "by affidavits or otherwise," specific facts showing that there is a genuine issue for trial[51] only with regard to the four reasons specifically identified, none of which related to whether the employment contracts were *factually* just-cause contracts, or at-will contracts.

IV

The central issue in the instant case, and in *Rowe,* is the same, namely, whether, on the facts and in the circumstances of the particular case, may Mary Rowe in *Rowe,* and the sales representatives, in the instant case, maintain actions for breach of an express contract.

That issue turns on whether there is sufficient evidence to justify a finding by the trier of fact that a reasonable person in the position of the employee-promisee in concluding that the employer-promisor intended, in the case of Mary Rowe, to provide employment not terminable at will, but only for cause,[52] or, in the case of the sales representatives, to pay a seven percent commission on renewals written while, and for as long as, they remained in the employ of the Auto Club.

[A] party's intention will be held to be what a

---

[50] Assuming, *arguendo,* that the plaintiffs' "contracts" were not at-will, then, at best, they were, "just cause" contracts, that is contracts permitting the Auto Club to make a change "for cause." The Auto Club's factual basis for changing its compensation system was, however, previously litigated. Def. Exh. D ("*Auto Club I*"). The findings of fact in *Auto Club I* collaterally estop the plaintiffs from claiming that the change was not for cause.

[51] MCR 2.116.

[52] *Rowe,* 687-688 (Levin, J.).

reasonable man in the position of the other party would conclude his manifestation to mean. [Cala-mari & Perillo, Contracts (3d ed), § 2-2, p 27.][53]

The test is, thus, objective, focusing on what a reasonable person in the position of the employee-promisee would understand. The subjective intent of the employer-promisor is not relevant, except insofar as a reasonable person in the position of the employee-promisee was, or possibly should have been, aware of the employer-promisor's sub-jective intent.

The signers of the lead and concurring opinions clearly err in focusing on whether the Auto Club actually "intended to bargain away its right to change the method of compensation," and in decid-ing whether there was "mutual assent" based on their assessment of the Auto Club's intent.[54]

---

[53] By the end of the nineteenth century, the objective theory had become ascendant and courts generally accept it today. True, a party may still avoid liability by showing that he did not even intend to engage in the actions by which he appeared to manifest his assent, for example, if he was falsely told that a writing had no legal effect or was compelled to sign by such force that he was a "mere mechanical instrument." But as long as he intended to engage in those actions, there is no further requirement that he must have done so with the intention of assenting to an agreement. It is enough that the other party had reason to believe that the first party had that intention. [Farnsworth, Contracts, § 3.6, p 114.]

See also *Goldman v Century Ins Co,* 354 Mich 528, 535; 93 NW2d 240 (1958).

See *Rowe,* ns 74 *et seq.* (LEVIN, J.)

[54] However, *it is not at all clear* from the statements allegedly made to members of Group c that *defendant intended* to bargain away its right to change the method of compensation. The meaning of the statements could be interpreted in several ways falling short of a contractual commitment. The state-ments *could have been intended* to bolster morale and enhance employee pride in the company. It is also possible the state-ments were merely stated opinions of management representa-tives that the company would not change its commission rate. Another possible interpretation is that the statements were

A

A number of the sales representatives asserted, in responses to interrogatories propounded by the Auto Club, that when they were employed they were told they should build books of business so that in later years they would earn a seven percent commission on policy renewals. Similar claims were advanced by sales representatives in *Bullock v Automobile Club of Michigan*, 432 Mich 472; 444 NW2d 114 (1989), and *Farrell v Automo-*

designed as assurances by management that in the foreseeable future, there were no rate changes planned. [RILEY, J., *ante*, p 543. Emphasis added.]

We note that nothing was offered by plaintiffs in addition to their continued employment that would reasonably prompt defendant to make such extraordinary contractual commitments. *We are persuaded* that it defies logic to believe that *defendant would intend to bind itself* to a specified renewal commission on the basis of isolated statements when plaintiffs had already accepted employment without the benefit of durational guarantees with regard to compensation. It also defies logic that defendant would enter into these commitments after, as opposed to before, being hired. *It is more reasonable* to believe that defendant would legally obligate itself to such a promise before hiring in order to attract an employee or induce acceptance of employment. In the case of Group C, *we can perceive no manifest reason for defendant to offer* a permanently fixed rate on renewals. [*Id.*, pp 544-545. Emphasis added.]

These changes made throughout the years suggest that it is *unlikely that defendant would permanently* guarantee a particular renewal policy. The numerous recent fluctuations show the company's changing compensation program and demonstrate that it was unreasonable for members of Group C to maintain any belief that their commission plan was to be locked in permanently. *For these* reasons, *we find* that in objectively reviewing the circumstances of this case, *there was no mutual assent* to establish seven percent renewal commissions permanently. *We are persuaded that defendant did not intend* to bargain away its right to make adjustments in its compensation plan. [*Id.*, pp 545-546. Emphasis added.]

*bile Club of Michigan (On Remand),* 187 Mich App 220; 466 NW2d 298 (1991).[55]

Bullock alleged that he was promised lifetime employment, and that " 'if he worked hard and built up his "book of business," he would be able to earn large sums of money' " and " 'enjoy his later working years with [the Automobile Club] by realizing commissions from the book of business' " based on the seven percent commission.[56] In *Bullock, supra,* p 485, this Court, in an opinion signed by Justices BOYLE, BRICKLEY, CAVANAGH and ARCHER, ruled that Bullock had "pled an action for a breach of an oral contract of employment alleged to have arisen at the commencement of his employment." I concurred in a separate opinion.

Farrell similarly claimed that his branch manager "had informed him at the time he was hired that his responsibility was to sell some insurance and to make his 'book' of insurance grow. According to plaintiff, [the branch manager] told him at the time of his hiring that he need only handle his book of business, sell some insurance and he would be set financially for the rest of his life if he worked at it for three or four years."[57]

---

[55] This Court remanded *Farrell* to the Court of Appeals for reconsideration in light of *Bullock. Farrell v Automobile Club of Michigan,* 433 Mich 913 (1989).

On remand, the Court of Appeals again ruled that the statements made to Farrell at the time of hiring were not "too indefinite as a matter of law to create an express oral contract." *Id.* at 226.

The Court of Appeals concluded that because the jury instructions failed to differentiate between Farrell's express-agreement and legitimate-expectations theories, the jury verdict should be set aside and a new trial held, and remanded for further proceedings.

Neither party filed an application for leave to appeal with this Court. We are advised that *Farrell* has been settled by agreement of the parties.

[56] He said that the " ' "book of business" is the accumulated memberships and policies which a commissioned salesman builds up over the years.' " *Id.* at 475-476.

[57] *Farrell v Automobile Club of Michigan,* 155 Mich App 378, 383; 399 NW2d 531 (1986).

One of the plaintiff sales representatives asserted, in response to interrogatories propounded by the Auto Club, that he observed at the time he was hired that the seven percent commission was about half that paid by other insurers, and he was told that while the seven percent commission might not seem much at the time, as the years go by the number of his accounts would grow so that seven percent would begin to pyramid to provide him a very comfortable living and lifestyle as long as he worked hard and continued to increase the volume of customers.

Some sales representatives did better than others. One, employed by the Auto Club for over thirty years, claimed, in responding to the interrogatories, that he had 8,000 to 9,000 accounts. Six sales representatives, employed for over twenty years, claimed that they had 5,000 or more accounts. Seven claimed that they had 4,000 to 4,800 accounts. Twenty-four that they had 3,000 to 3,900 accounts. Thirty-nine that they had 2,000 to 2,900 accounts, and the balance claimed that they had less than 2,000 accounts.

B

The Auto Club has not denied the allegations in the complaint, as supplemented by the answers to interrogatories, that the sales representatives were encouraged to build books of business and were told that they would be rewarded for their efforts by earning a seven percent commission on policy renewals.

The Auto Club contends, rather, that because it had been advised by its accountants that it was no longer economically advisable or good business to pay a seven percent commission on new sales and policy renewals, that it could not only revise the commission system so that it would no longer be

obliged to pay a seven percent commission on new sales, but could also refuse to pay a seven percent commission on policy renewals of old sales to those sales representatives who had built up their books of business *beyond less than 2,000 to 3,000, 4,000, or 5,000 or more accounts.*

The Auto Club states, on brief without supporting affidavit, that its position is justified because it never told the sales representatives that the "commission paid could never be changed or would never change." A number of sales representatives asserted, however, in their *answers to the interrogatories,* that that is precisely what they were told. That dispute frames an issue of fact.

The factual dispute whether particular sales representatives were told that the commission to be paid on policy renewals of prior sales would not be changed cannot properly be resolved against the claims of the sales representatives who so assert without a trial on the merits.

The signers of the lead opinion find as a fact that "there were no representations made to plaintiffs with regard to deferred compensation." They further find as a fact that "renewal commissions or future commissions do not rest upon the sale of the original policy," but rather require "additional effort and consideration by salespersons in keeping policies alive." They assert and find that, unless otherwise agreed—*ignoring that the sales representatives assert that it was otherwise agreed*—the right to renewal commissions does not "rest upon the sale of the original policy."[58]

---

[58] RILEY, J., *ante,* p 530.

See *Av-Med, Inc v French,* 458 So 2d 67, 68 (Fla App, 1984), where the court said that although it might be necessary to "service" the clients in order to obtain renewals, a condition precedent to the receipt of renewal commissions, the plaintiffs were entitled to renewal commissions less the cost of servicing the clients.

See also *Glass v Minnesota Protective Life Ins Co,* 314 NW2d 393, 396 (Iowa, 1982).

A number of sales representatives do assert that representations were made to them that they would benefit from building books of business and that they would thereby earn commissions on policy renewal of old sales. Because this case has not been tried, the record is incomplete whether less effort may be required to obtain a policy renewal of an old sale than to prospect for new sales.

It may very well be that little or no "additional effort" need be exerted by a sales representative to obtain a policy renewal where the customer sends a check promptly after receipt of a bill for a renewal from the Auto Club. In such cases, a renewal commission might, contrary to the assertion of the majority, be a form of deferred compensation. Renewal commissions may also be a form of deferred compensation in those cases where some additional effort, although less than that of prospecting for a new sale, is required to earn the renewal commission.

In all events, the questions whether representations were, in fact, made to plaintiffs with regard to deferred compensation, and whether renewal commissions are in part deferred compensation, depend on the agreement of the parties, and cannot be decided as a matter of law without a trial on the merits. The majority's analysis begs the question whether the correct construction of the oral contracts of employment between the Auto Club and the sales representatives permitted the Auto Club to change or eliminate the seven percent commission it had agreed to pay on policy renewals of old sales.

C

The course of performance for over twenty-five years would appear to support a finding that renewal commissions were *not* payable on policies renewed after a sales representative ceased to be an employee of the Auto Club.

Forty sales representatives testified on deposition that they were told or informed, before or after they were hired, that they would receive a seven percent commission on renewals, either *"for as long as they were employed by the Auto Club,"* or "forever," *or* "always." Their testimony, together with the other evidence set forth in the responses to the interrogatories propounded by the Auto Club, and the evidence of the course of performance for over twenty-five years, would appear to be sufficient to permit the trier of fact to conclude, were the majority to allow this case to go to trial, that the Auto Club's conceded promise to pay a seven percent commission on policy renewals was a promise, as set forth in the complaint, to pay all one hundred seventy-nine sales representatives a seven percent commission "on each renewal that they wrote during their *entire employment.*"

D

The majority holds, in effect, that because the course of performance—indicating that the promise to pay a seven percent commission applied to renewals while the sales representative remained in the employ of the Auto Club but did not apply to renewals after he ceased to be employed by the Auto Club—was not stated to all potential sales representatives when they were interviewed and

hired, the course of performance is not a part of the contract of employment.[59]

"Course of performance" is the context, the circumstances, in which a promise is made, and is generally established by evidence, often oral, separate and apart from evidence of the promissory exchange and manifestations. The enforceability of the oral employment contracts does not depend on whether the promisor explicitly stated the course of performance.

Usage is compelling evidence concerning not only the obligations of the sales representatives, but also the durational term of the Auto Club's promise to pay a seven percent commission on policy renewal of old sales. Further, it is well

---

[59] Professor Farnsworth reported:

Even without explicit incorporation, an agreement may be fleshed out by usages to which the parties are subject, by a course of dealing between the parties prior to their agreement, or by a course of performance between them after their agreement. Indefiniteness may also be cured by the addition of such implied terms as will be supplied by law, including—at least as to minor items—the parties' implied obligations of good faith and fair dealing. [Farnsworth, Contracts, § 3.28, p 196.]

The Restatement of Contracts provides:

An agreement is supplemented or qualified by a reasonable usage with respect to agreements of the same type if each party knows or has reason to know of the usage and neither party knows or has reason to know that the other party has an intention inconsistent with the usage. [2 Restatement Contracts, 2d, § 221, p 151.]

(1) A course of dealing is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.
(2) Unless otherwise agreed, a course of dealing between the parties gives meaning to or supplements or qualifies their agreement. [*Id.,* § 223, pp 157-158.]

See also Farnsworth, Contracts, § 7.13, pp 508-514; Calamari & Perillo, Contracts (3d ed), § 3-17, p 178.

established that terms will be implied as part of the agreement of the parties where necessary to give business efficacy to a promise in a contract.[60]

Professor Farnsworth stated that "[c]ourts have often supplied a term calling for best efforts under exclusive dealing agreements," as in *Wood v Lucy, Lady Duff-Gordon,* 222 NY 88; 118 NE 214 (1917). Farnsworth explained that since Lady Duff-Gordon's "remuneration depended entirely on [Wood's] efforts, the court supplied a term requiring that Wood use his best efforts to sell her fashions." Farnsworth continues that "[c]ourts also supply terms requiring best efforts under percentage leases. . . . If the lease is silent on the matter, the court will supply a term requiring the lessee to use best efforts, in addition to the normal obligation of good faith."[61]

This Court has implied a term requiring a lessor to supply water to a building constructed for the operation of a restaurant. *Stimac v Wissman,* 342 Mich 20; 69 NW2d 151 (1955).[62]

Accepting as true the pleaded allegations of the

[60] See *Onderdonk v Presbyterian Homes of N J,* 85 NJ 171, 183-184; 425 A2d 1057 (1981).

Professor Corbin stated:

> Promises by an employer or principal have been found by implication in cases where there is an express promise by the employee or agent to render service, the implied promise being something other than merely to pay compensation. The employer of an act or other artist who is under contract to render exclusive service may be found to have impliedly promised to afford a reasonable opportunity to act or to perform, thereby building up a reputation for artistry and skill. When a skilled workman promises that all his inventions shall become the property of his employer, for a royalty in case of use or sale, there may be an implied promise by the employer to afford facilities for invention and to market the product. [3 Corbin, Contracts, § 567, p 324.]

[61] Farnsworth, Contracts, § 7.17, pp 530-531.

[62] The New Jersey Supreme Court held that a contract between a home for the elderly and its residents implicitly obligated the home to

sales representatives,[63] as supplemented by the
answers to the interrogatories, where an insurer,
the Auto Club, promises to pay a seven percent
commission on policy renewals of old sales and
encourages its sales representatives to build books
of business to pyramid their earnings, the trier of
fact may properly find that the insurer has by
implication agreed—in order to give business effi-
cacy to the promise that induces such effort—that
it will not change or eliminate the rate of commis-
sion it agreed to pay on policy *renewals* of old
sales.

---

furnish residents with financial accountings for monies paid in
monthly charges. *Onderdonk,* n 60 *supra.*

In *Fashion Fabrics of Iowa v Retail Investors Corp,* 266 NW2d 22
(Iowa, 1978), the Iowa Supreme Court implied a covenant by a
sublessor to continue operating its business on premises adjacent to
those leased by the sublessee.

In *Fenning v American Type Founders,* 33 NJ Super 167; 109 A2d
689 (1954), the court held that a licensing agreement, containing no
express provision for payment of minimum royalties and referring to
no minimum standard of performance, nonetheless implied an obliga-
tion that the defendant would exert reasonable efforts and due
diligence in marketing the licensed product.

In *Stein v Spainhour,* 167 Ill App 3d 555; 521 NE2d 641 (1988), the
court held that a percentage lease implied the obligation to continue
operating the business on the premises, and therefore the lessee
remained liable for rent, based on the average rent in prior years,
even if the lessee terminated the business.

In *Seggebruch v Stosor,* 309 Ill App 385, 389-390; 33 NE2d 159
(1941), the court affirmed an award of the reasonable rental value of
premises, leased for use as a gas station at a rental of 1¼ cents per
gallon sold, where the tenant opened a competing station across the
street. The court said: "[I]t was clearly implied that defendant would
use reasonable diligence in operating the gas station on plaintiff's
premises. . . . 'What is implied in an express contract is as much a
part of it as what is expressed' . . . ."

In *Baker's Aid v Hussman Foodservice Co,* 730 F Supp 1209 (ED
NY, 1990), the court implied an obligation to purchase and pay for
ovens manufactured to buyers' specifications.

In *Ohio Turnpike Comm v Texaco, Inc,* 35 Ohio Misc 99; 297 NE2d
557 (1973), the court implied a term requiring Texaco to sell all the
gasoline that drivers on the Ohio Turnpike would purchase from
Texaco Service Plazas during a gas shortage.

[63] The Auto Club's motion for summary disposition did not address
all the allegations of the complaint as supplemented by the answers
to the interrogatories.

E

The sales representatives alleged in their complaint that they were promised they would not be disciplined or fired without just cause. The Auto Club denies the allegation of just-cause contracts, and contends that the contracts of employment are at will. The majority ignores the sales representatives' well-pleaded allegation that the Auto Club expressly agreed to just-cause contracts.

The correct construction of the contracts of employment does not depend, however, on whether the Auto Club expressly agreed that the sales representatives could only be discharged for good or just cause. Even if the Auto Club did not expressly so agree, when it agreed that the sales representatives would be paid a seven percent commission on policy renewals of old sales, it agreed, by implication, that the sales representatives would not be deprived, as a result of discharge from employment other than for good or just cause, of the opportunity to earn the seven percent commission on policy renewals of old sales by exerting whatever additional effort, if any, might be required to obtain such renewals.[64]

---

[64] Professor Corbin stated:

> If a contract is such that a certain performance by one party is necessary in order to earn the compensation that has been promised him, and that performance can not be rendered without the active co-operation of the other party, *a promise to render such co-operation will usually be implied.* [3 Corbin, Contracts, § 570, pp 346-347. Emphasis added.]

> In any kind of contract, if the right of one party to compensation is conditional upon the rendition of some service or other performance by him or on his behalf, it is nearly always a breach of contract for the other party to act so as to prevent *or to hinder and delay or to make more expensive the performance of the condition.* [*Id.,* § 571, p 349. Emphasis added.]

See ns 6-8 and 14 and accompanying text.

V

I conclude that the trier of fact could properly find that

—The term "policy renewal" means an insurance policy issued when a customer accepts an insurer's offer to renew a policy.

—A promise to pay a commission on policy renewals is, therefore, implicitly a promise to pay a commission on policy renewals for as long as the insurer and the customer choose to renew an earlier policy.

—When the Auto Club indisputably promised to pay its sales representatives a seven percent commission on policy renewals, it *expressly* promised and contracted that it would pay a seven percent commission on renewal of a policy first written before the announcement that the Auto Club would no longer pay renewal commissions, *for as long as the Auto Club and the customer choose to renew the policy,* even though a durational term for the promise was not *explicitly* stated.

—Because the course of performance and other evidence tends to show that a renewal commission would not be payable after a sales representative left the employ of the Auto Club, the express promise to pay a seven percent commission on policy renewals meant for "as long as the Auto Club chooses to offer to renew the policy, the customer chooses to accept the offer, and the sales representative remains in the employ of the Auto Club."

VI

The lead opinion's reference to "the traditional reluctance of courts to interfere with management

decisions and the needed flexibility of businesses to change their policies to respond to changing economic circumstances"[65] suggests that the construction of employment contracts is henceforth to be subject to different rules than other business contracts.[66]

If the correct construction of these contracts is that the Auto Club obligated itself to pay a seven percent commission on renewal after 1977 of policies sold before 1978, the Auto Club did not have a managerial prerogative to break that contract without paying damages. Nor does the "needed flexibility of businesses to change their policies to respond to changing economic circumstances" entitle the Auto Club to break a contract without paying damages.

The theme of the majority[67] appears to be that, because the business community generally needs to be able to change the compensation of employ-

---

[65] RILEY, J., *ante,* p 532.

[66] The signers of the lead opinion express their disbelief—"it defies logic"—that the Auto Club "made extraordinary contractual promises that the commission system would be in place 'forever.'" *Id.,* pp 544 and 543. I find it extraordinary that they assume the role of trier of fact.

[67] First, whether plaintiffs have actions for breach of contract on the basis that they were informed of a *particular compensation* system upon entering defendant's work force, and the system was subsequently changed. [*Id.,* p 524. Emphasis added.]

Given the traditional reluctance of courts to interfere with management decisions and the needed flexibility of businesses to change their policies to respond to changing economic circumstances, we conclude that *Toussaint* should not be extended to create legitimate expectations of a permanent compensation plan. [*Id.,* p 532.]

We would, in effect, be allowing the factfinder to determine that, despite the fact that the defendant retained the right to discharge these employees when it hired them, it nonetheless intended to assume the risk of a drop in its cash reserves. [BOYLE, J., *ante,* p 556.]

ees in response to changes in the business, the economy, or competition, promises respecting compensation will be construed as reserving to the employer a power to change compensation, absent compelling evidence that the employer did not intend to reserve a power to change the compensation. This theme was expressed by Justice Griffin in dissent in *Bullock, supra* at 519-520:

> An employer's intention to give up permanently a right so fundamental as the ability to make changes in its method of compensation is not to be lightly inferred.[68]

While the sales representatives originally asserted in this action that the Auto Club had committed itself to pay the seven percent commission on new sales generated at any time while they remained in the employ of the Auto Club and, thus, was not at liberty to revise the compensation system, even for new sales, they no longer assert that the Auto Club agreed not to revise the commission system for new sales. They have now limited their claims to the assertion that the Auto Club was not at liberty to change the seven percent commission on renewals of policies sold before the announcement of the revised compensation system.[69]

The sales representatives thus no longer challenge the managerial prerogative to change the rate of compensation, except insofar as the employer promised to pay commissions on renewal of old sales. Recognition of the legitimacy of the sales representatives' claims would not, accordingly, undermine the asserted managerial prerogative to

---

[68] This language is quoted in Riley, J., *ante,* p 542.

[69] See part I.

change compensation, except insofar as the employee expended effort in generating sales and building a book of business in the expectation that he would have the opportunity of obtaining further compensation should the customer renew the policy and continue to do business with the employer.

## VII

Turning to the statute of frauds, the Auto Club asserts, and the signers of the lead opinion and I agree, that the employment contracts were not for a fixed term of years. Indeed, it is well established that an employment contract, other than for a fixed period of time, can be performed within one year[70] because the employee may die within the year, and does not violate the one-year statute of frauds.[71]

The signers of the lead opinion justify their conclusion that the agreement to pay a seven percent commission on policy renewals is within the one-year statute by severing the promise to pay a seven percent commission on new sales from the promise to pay a seven percent commission on renewals, treating the latter promise as a separate and distinct contract.[72] The lead opinion then holds that this promise is within the statute because it was not "possible for renewal commissions to *accrue*" within one year.[73]

The Auto Club indisputably agreed to pay "a 7%

---

[70] See n 24 for text.

[71] See 1 Restatement Contracts, 2d, § 130, illustrations to comment a, pp 328-329.

[72] [W]e find the provisions affording seven percent renewal commissions to plaintiffs severable from the remainder of the employment contracts. [RILEY, J., *ante,* p 539.]

[73] *Id.*

commission on new sales *and* policy renewals."[74]
At least some part—if the case were tried, it might
appear a very substantial part[75]—of the compensa-
tion for a new sale is the opportunity to earn a
commission on a policy renewal. It is entirely
artificial to view such an employment contract,
whereunder the employer concededly agreed to
pay "a 7% commission on new sales *and* policy
renewals" and which the employee accepted by
generating new sales and policy renewals, as con-
stituting two separate contracts.

The question whether a contract can be per-
formed within a year depends on the *duration of
the contract,* and not on the time of performance
of a *particular term* of the contract.[76] Accordingly,
the sales representatives' employment contracts—
not for a fixed term, and hence not within the
statute because the employee may die within the
year—are not brought within the statute irrespec-
tive of whether renewal commissions could accrue
within the year.

A

The lead opinion relies on *McLaughlin v Ford
Motor Co,* 269 F2d 120 (CA 6, 1959), where the
employee was allegedly promised that after he
worked for one year in the cost department, he
would be offered a position in general manage-
ment. The United States Court of Appeals for the
Sixth Circuit found that the action could not be
maintained because, among other things, the
agreement was invalid under the statute of frauds.

[74] See n 17.

[75] See part IV, ns 55 *et seq.*

[76] See *Hodge v Evans Financial Corp,* 262 US App DC 151; 823 F2d
559 (1987), discussed in part VII(B), *infra.*

According to the lead opinion, the Court "reasoned that the parol agreement was invalid because the plaintiff could not have become a general manager until more than one year had elapsed from the time of the agreement."[77]

In *McLaughlin,* the court said:

> It is clear that the *oral agreement* in the present case provided for employment *to begin* more than a year after the making of the agreement and comes squarely within the terms of the statute. *Davis v Michigan Mutual Life Ins Co,* 127 Mich 559; 86 NW 1021 [1901]; *Gudenau v Farm Crest Bakeries, Inc,* 268 Mich 399; 256 NW 462 [1934]; *Lawton v Contract Purchase Corp,* 298 Mich 712, 720; 299 NW 777 [1941]. [*Id.* at 124. Emphasis added.]

McLaughlin was allegedly told that if he accepted a job in the cost department "for a year," he would thereafter be given a job in general management. In the Michigan cases cited by the Sixth Circuit, the employees asserted that they had entered into oral contracts of employment for *one year,* to begin at a subsequent date. Such contracts are deemed to be for a fixed term, and are covered by the statute.[78] The contracts entered into by the sales representatives in the instant case, however, were not for a fixed term.

---

[77] RILEY, J., *ante,* p 534.

[78] *Id.,* pp 534-536.

5. A orally promises to work for B, and B promises to employ A for *five years* at a stated salary. The promises are within the Statute of Frauds. Though the duties of both parties will be discharged if A dies within a year, the duties cannot be "performed" within a year. This conclusion is not affected by a term in the oral agreement that the employment shall terminate on A's death. [1 Restatement Contracts, 2d, § 130, comment b, illustration 5, p 329. Emphasis added.]

B

The traditional and correct analysis, adhered to by this Court[79] and courts throughout the land,[80] is set forth in a recent decision of the United States Court of Appeals for the District of Columbia Circuit, *Hodge v Evans Financial Corp*, 262 US App DC 151, 154; 823 F2d 559 (1987), where the employee claimed he had been discharged from his position as general counsel in violation of an oral contract to employ him permanently. He argued successfully that the contract was not within the statute because "it is capable of full performance within one year if the employee were to die within the period." The court said that this "view of the statute's applicability to lifetime or permanent employment contracts has, in fact, been accepted by an overwhelming majority of courts and commentators." *Id.*

The *Hodge* court addressed the kind of contract considered in *McLaughlin,* and in the three Michigan cases on which *McLaughlin* relied, when it said:

> Under the conventional view of the statute, an oral employment contract for a stated, definite term of years exceeding one year . . . is unenforceable on the rationale that the employee's possible death within one year would "defeat" rather than "complete" the express terms of the contract.[81]

The court observed that, far from asserting the existence of a contract for a fixed term, Hodge's

---

[79] See *Adolph v Cookware Co*, 283 Mich 561; 278 NW 687 (1938); *Lynas v Maxwell Farms*, 279 Mich 684; 273 NW 315 (1937); *Fothergill v McKay Press*, 361 Mich 666; 106 NW2d 215 (1960).

[80] See n 85.

[81] *Hodge, supra,* p 155.

employer—like the Auto Club—had consistently argued that the plaintiff "must be deemed to be an at-will employee precisely because he was *not* promised employment for 'any fixed period of time.' " *Id.* at 155. (Emphasis in original.)[82]

The employer had argued that the contract was within the statute because a letter from the employer[83] stated that the employee would receive a minimum bonus of $6,000, not payable for more than a year from the making of the contract. The court said that the letter referred only to "a particular contract term" *and was not pertinent to the question of the duration of employment:*

> *Courts have specifically and consistently held that the presence of bonus or salary terms payable after one year does not bring a long-term indefinite employment contract within the statute.* [*Id.* at 157. Emphasis added.]

The inquiry, then, is not whether it was "possible for renewal commissions to accrue" within one year, but whether the *duration of the contract* was

---

[82] The court in *Hodge* added:

No court or commentator has ever suggested that the possibility of the employee's death within one year would "defeat" rather than "complete" such a contract. To the contrary, courts and commentators have consistently accepted the view that indefinite permanent employment contracts such as Hodge's fall outside the statute because they are capable of full performance within one year. See, e.g., 2 Corbin, Contracts, § 446, pp 549-550 (Permanent employment contracts fall outside the statute because "[t]he word 'permanent' has, in this connection, no more extended meaning than 'for life.' "); 3 Williston, Contracts, § 495, p 582 ("A promise of permanent personal performance is on a fair interpretation a promise of performance for life, and therefore not within the Statute."). [*Id.* at 156.]

[83] The letter was, apparently, only a partial integration of the terms of the employment contract. The contracts of employment between the Auto Club and the sales representatives are oral, and therefore the parol evidence rule is not involved in this case.

for a fixed term of one year or more. The contracts
of employment with the sales representatives were
not, as the Auto Club consistently argued, for a
fixed term.

In *Toussaint,* p 612, n 24, this Court said that
"an agreement for an indefinite term is generally
regarded as not being within the proscription of
the statute of frauds." In *Rowe v Montgomery
Ward,* p 636, this Court said that "oral contracts for
an indefinite term, *which fall outside the statute
of frauds,* will be recognized only where circum-
stances suggest both parties intended to be
bound." (Emphasis added.)[84]

C

A number of courts[85] have held that an employ-

---

[84] See also *Bullock,* p 523 (Griffin, J.):

The undisputed trend of authority has been to interpret the
"one year" provision as applying only to contracts that have *no*
possibility of being completed within a year, even if the parties
to the contract in fact contemplated a longer period. [Emphasis
added.]

Noteworthy in this connection is the *Hodge* court's remark that,
while the conventional view of the statute is "legalistic," the statute
itself is "widely understood as a formal legal device that shields
promise breakers from the consequences of otherwise enforceable
agreements." *Hodge, supra* at 157.

The New York Court of Appeals similarly noted that the statute
was designed

to prevent the enforcement of unfounded fraudulent claims.
But, as Professor Williston observed: "The Statute of Frauds
*was not enacted to afford persons a means of evading just
obligations;* nor was it intended to supply a cloak of immunity
to hedging litigants lacking integrity; nor was it adopted to
enable defendants to interpose the Statute as a bar to a
contract fairly, and admittedly, made" (4 Williston, Contracts
[3d ed], § 567A, pp 19-20). [*Morris Cohon & Co v Russell,* 23
NY2d 569, 574; 245 NE2d 712 (1969).]

[85] *White Lighting Co v Wolfson,* 68 Cal 2d 336; 66 Cal Rptr 697; 438

ment contract that is not for a fixed term of years is enforceable although a payment obligation would not accrue until after a year had passed.

In *White Lighting Co v Wolfson,* 68 Cal 2d 336; 66 Cal Rptr 697; 438 P2d 345 (1968), an employee was promised a salary, benefits, and one percent of gross sales per year. The contract did not specify a durational term. The employer claimed that the contract was unenforceable because of the statute of frauds.

The court held that "[s]ince . . . the alleged oral contract may be terminated at will by either party, it can, under its terms, be performed within one year." *Id.* at 344. Further, although the amount of the bonus could not be determined or paid until more than one year after the time of contracting, the bonus clause, as well as the salary and benefit provisions, was enforceable. The key issue was whether the contract, *in its entirety,* could be fully performed within a year.[86]

The signers of the lead opinion fail to differenti-

---

P2d 345 (1968); *Miller v Riata Cadillac Co,* 517 SW2d 773, 776 (Tex, 1974) ("the fact [that] a bonus cannot be ascertained and paid until after the year in which services were rendered does not bring the contract within the Statute of Frauds"); *Murphy v Buschman-Jennings, Inc* 382 SW2d 29 (Mo App, 1964) (the same for an agreement for an indefinite term, even though the bonus was payable after a year had passed); *Dennis v Thermoid,* 128 NJL 303; 25 A2d 886 (1942) (a year-long contract is outside the statute although a yearly bonus calculated and paid thereafter); *Finley v Aetna Life & Casualty,* 202 Conn 190, 197; 520 A2d 208 (1987) (contracts of indefinite duration " 'simply excluded' " from one-year provision of statute); *Spindel v Nat'l Homes Corp,* 110 Ga App 12, 15; 137 SE2d 724 (1964) (same, even though the contract may not be performed within one year); *Weiner v McGraw-Hill, Inc,* 57 NY2d 458; 457 NYS2d 193; 443 NE2d 441 (1982) (same whether the contract was terminable at will or for just cause only); *Price v Mercury Supply Co,* 682 SW2d 924, 932 (Tenn App, 1984) (listing cases in which state supreme court holds an oral employment contract for an unspecified term outside the statute because it is capable of complete, *bona fide* performance within one year of its making should the employee die within that time).

[86] See also *Foley v Interactive Data Corp,* 47 Cal 3d 654; 254 Cal Rptr 211; 765 P2d 373 (1988) (reaffirming *White Lighting* and holding further that a *just-cause* contract is outside the statute of frauds).

ate between a contract that is fully performable
within a year, and one that is not. Taking as true
the allegations of the sales representatives, and
assuming the validity of the Auto Club's conten-
tion that employment was at will, the employment
contract calling for the Auto Club to pay its agents
a seven percent commission on the sale of new
policies and a further seven percent on renewals of
those policies would be fully performed within a
year should either party terminate, or any of the
sales representatives die, *even if* no renewal com-
missions were earned.

### D

The Auto Club has introduced no evidence to
support a finding that the sales representatives
would have entered into the employment contract
had it provided only for a seven percent commis-
sion on new policies sold. The agreement to pay
seven percent on renewals is not a separate and
independent agreement. The employment con-
tracts must be considered in their entirety.[87]

---

A separate oral contract was reached between Wolfson and his
employer, calling for White Lighting to pay Wolfson one month's
severance pay and his moving expenses to Chicago, and to repurchase
5,000 shares of White Lighting stock from Wolfson for $15,000. The
court enforced the first two promises, but not the third, which
violated the section of the statute of frauds governing sales of goods
for over $500 (rather than its one-year provision):

> If a claimant alleges two or more promises of performance
> "that can easily be distinguished and separated by the court by
> reference to the agreement itself" (2 Corbin, Contracts, § 313,
> pp 127-128), only that promise of performance which falls
> clearly within the statute of frauds cannot be enforced. [68 Cal
> 2d 345.]

[87] In determining whether the terms of a contract are severable,
courts look to the intention of the parties. (73 Am Jur 2d, Statute of
Frauds, § 524, p 155; 71 ALR 475, *Statute of frauds—divisibility,* and
cases cited therein.) Two principal factors are considered: first,

The cases cited by the lead opinion for its conclusion that the contract's terms are severable are not analogous. *Cassidy v Kraft-Phenix Cheese Corp,* 285 Mich 426; 280 NW 814 (1938), addressed a wholly executory contract for the sale of goods over $100, where the Uniform Commercial Code provides that part performance will take the contract out of the statute of frauds. *City of Lansing v Lansing Twp,* 356 Mich 641; 97 NW2d 804 (1959), dealt not with the statute of frauds, but with apportionment of costs between the two parties to

"whether the two or more promises or parts of the contract are so interdependent or interwoven that the parties must be deemed to have contracted only with a view to the performance of both, and would not have entered into one without the other"; and second, whether the consideration for the several promises can be apportioned among them without doing violence to the contract or making a new contract for the parties. 3 Williston, Contracts (3d ed), § 532, p 764. However, "[e]ven though the consideration for each agreement is distinct, if the agreements are interdependent and the parties would not have entered into one in the absence of the other, the contract will be regarded . . . as entire and not divisible." *Id.,* p 765.

In *Co-Operative Telephone Co v Katus,* 140 Mich 367; 103 NW 814 (1905), an action on an unsigned writing to recover the price of a capital subscription, this Court looked to the intention of the parties to determine whether the two parts of a contract were so interdependent that neither part should be enforced. The contract consisted of the defendant's agreement to subscribe to the plaintiff's capital stock (not within the one-year statute of frauds), and his agreement to rent a telephone from the plaintiff for a period of three years (within the statute). The two agreements were held *not* severable: the defendant agreed to subscribe to the capital stock *only* because he wanted to obtain the telephone, and he would not have otherwise agreed to subscribe. Since the contract was entire and unseverable, the plaintiff could not enforce either part of the contract against the defendant.

Similarly, *Bunch v Garner,* 208 Ala 271; 94 So 114 (1922), held a two-part oral agreement entire and therefore unenforceable. The parties agreed to form a corporation (not within the statute) and agreed that the plaintiff should serve and manage the corporation for five years (within the statute). The court found that the parts of the contract were inseparably interwoven, and could not be divided without doing violence to the intention of the parties.

The employment contracts between the Auto Club and its sales representatives provided for a seven percent commission on every new policy sold and, in the event such a policy was renewed, an additional seven percent commission. No sales representatives were eligible to receive renewal commissions on policies they had not sold originally.

a written construction contract. *Stevenson v Brotherhoods Mutual Benefit,* 312 Mich 81; 19 NW2d 494 (1945), dealt with a claim for post-discharge commissions under a written employment contract.

E

Even assuming that the employment contracts violated the statute of frauds because they were not in writing, they are still enforceable because the Auto Club has acknowledged, in affidavits filed in this proceeding, that the sales representatives were hired on the understanding that the Auto Club "paid a 7% commission on new sales and policy renewals."[88] The Restatement of Contracts provides:

> Memorandum Not Made as Such
> Except in the case of a writing evidencing a contract upon consideration of marriage, *the Statute may be satisfied by a signed writing not made as a memorandum of a contract.* [1 Restatement, Contracts, 2d, § 133, p 345. Emphasis added.][89]

---

[88] See n 17.

[89] Comment (d) to this section continues:

> A written pleading, stipulation or deposition may serve as a memorandum if otherwise sufficient as to contents and signature. An oral statement before the court is treated in some states as the equivalent of a signed writing. See [UCC] §§ 2-201(3)(b), 8-319(d). Where the writing or oral statement is made under legal compulsion, it is nonetheless effective unless there is a contrary procedural policy in the state. [*Id.* at 347.]

Similarly, Professor Farnsworth stated:

> Courts agree that a writing is not insufficient as a memorandum merely because it has been made in a court proceeding, at least if the writing was made voluntarily. To the extent that the statute's function is viewed as evidentiary, it is difficult to see why the statute should not be satisfied by a written admis-

This Court,[90] and other courts,[91] have so held.

According to the lead opinion, the Auto Club's admission that it agreed to pay the plaintiffs seven percent on new policies and renewals is insufficient to take the contract out of the statute of frauds because the Auto Club did not admit that the compensation scheme would remain in place "forever." The durational term is not relevant to proper resolution of this case. The sales representatives no longer question the Auto Club's right to change its compensation scheme at any time, but seek only to construe the contract so as to enforce the benefit of the bargain with respect to renewals of policies sold before the change.

In all events, courts in Michigan and elsewhere have held, contrary to the view taken by the signers of the lead opinion, that a writing sufficient to satisfy the statute of frauds need not state all the material terms of the contract, nor even

sion in a pleading, stipulation, or deposition, even though it is in the same action in which the statute is raised as a defense. [Farnsworth, Contracts, § 6.7, p 408.]

See also Calamari & Perillo, Contracts (3d ed), § 19-30(c), p 821.

[90] See *Brender v Stratton,* 216 Mich 166, 176; 184 NW 486 (1921), where the Court found written concessions in the pleadings sufficient to satisfy the provision of the statute requiring that a trust in land be evidenced in writing.

[91] *Adams-Riker, Inc v Nightingale,* 383 A2d 1042, 1044 (RI, 1978) (the writing requirement is dispensed with when the party to be charged admits the agreement); *Wemhoff v Investors Mgmt Corp of America,* 528 A2d 1205, 1207 (DC App, 1987) (an in-court admission that the oral agreement exists, though not necessarily a complete statement of the essential terms of the contract, is adequate to bar the defense under statute); *Trossbach v Trossbach,* 185 Md 47, 55; 42 A2d 905 (1945) ("[a]dmissions of a party in testifying, though in form evidence, are in essence not mere evidence, but make evidence against him unnecessary"); *Wolf v Crosby,* 377 A2d 22 (Del, 1977) (the defendant may not admit the agreement and simultaneously assert the statute-of-frauds defense); *Smith v Boyd,* 553 A2d 131, 133 (RI, 1989) ("to allow the statute to excuse a party's performance, when such party admits all elements essential to a valid contract, does not involve a perjurious claim and would create an injustice"). See also 2 Corbin, Contracts, § 320, p 154.

the substance of controverted terms, but need only
confirm that a contract was, in fact, made.[92]

---

[92] *Opdyke Investment Co v Norris Grain Co,* 413 Mich 354; 320
NW2d 836 (1982), involved an alleged oral agreement to construct a
sports arena in Pontiac, breached by the defendants. They asserted
that letters exchanged between the parties were too incomplete to
satisfy the statute of frauds since the letters did not specify a
construction site for the arena, a time for its completion, or a date on
which the plaintiffs were to take possession.

The Court stated that, in Michigan, a writing no longer had to be
complete to satisfy the statute:

> [T]he "nothing in parol" approach to the statute of frauds
> has been so dishonored in this Court that it has lost any claim
> to legitimacy. [Michigan] cases establish the principle that
> extrinsic evidence may be used to supplement, but not contra-
> dict, the terms of the written agreement. In the absence of
> extrinsic supplemental evidence, the court may infer that the
> parties intended a "reasonable" or "good faith" term as part of
> the contract. [*Id.,* p 367. Citations omitted.]

The sales representatives seek no more than to imply a "good faith"
term, so that the Auto Club may not deprive them of the fruit of their
labor by refusing to pay the seven percent renewal commissions on
the books of business they worked so hard to build.

In enforcing the contract, the *Opdyke* Court adopted Corbin's view
that only "[s]ome note or memorandum having substantial probative
value in establishing the contract must exist"; 2 Corbin, Contracts,
§ 498, p 683. The letters satisfied this requirement.

See also *Wemhoff,* n 91 *supra,* in which a salesman of tax-sheltered
annuities claimed that his employer promised to pay commissions on
contributions made to the plan by his customers after he was fired.
The employer admitted the employment relationship, but argued that
the contract violated the statute of frauds, and denied any promise to
pay commissions after discharge. Nevertheless, the court held that
the admitted existence of an employment agreement was sufficient to
satisfy the statute, and remanded the case for trial on the plaintiff's
right to postdischarge commissions.

In *Hackney v Morelite Construction,* 418 A2d 1062, 1065, n 1 (DC
App, 1980), the court said,

> [T]he statute . . . does not require an exhaustive, integrated
> statement of the agreement in writing, but only a sufficient
> statement to establish that there in fact *was* an agreement and
> that the party charged should be bound by it.

The court went on to allow parol evidence to explain ambiguous
terms in the writing at issue and supply omitted terms in accordance
with the usual law of contracts.

See also *Haas v Cravatta,* 71 Ill App 3d 325; 27 Ill Dec 414; 389

F

While the signers of the lead opinion err in their assertion that the part performance doctrine may be applied to remove only contracts involving land from the statute of frauds,[93] Michigan case law does not appear to support the sales representatives' argument that their partial performance, through their sale of the original new policy, removes their employment contracts from the confines of the one-year provision of the statute. Although there is authority to the contrary,[94] resolution of this issue does not depend on overruling *Ordon v Johnson,* 346 Mich 38; 77 NW2d 377 (1956), and establishing a part performance exception to the statute of frauds.

---

NE2d 226 (1979) (an action for specific performance of a land-sale contract; although the memorandum evidencing agreement was omitted, inter alia, closing date, due date, and requirement of clear title, the statute of frauds did not render the contract unenforceable); *Buechner v Rouse,* 538 P2d 117, 118 (Colo App, 1975) (a memorandum of oral agreement to employ the plaintiff "as long as he was a stockholder" was not insufficient to satisfy the statute of frauds, although it did not contain the durational term: "Parol evidence is admissible to supply terms omitted from a written agreement," citing *Harmon v Waugh,* 160 Colo 88; 414 P2d 119 [1966]).

Farnsworth states:

> *Omission of a term is never fatal* [under the statute of frauds] *if the court will supply it by implication.* [§ 6.7, p 411. Emphasis added.]

[93] Michigan cases hold that part performance takes a contract outside of the statute of frauds in cases involving the sale of goods over $500, *Cassidy v Kraft-Phenix Cheese Corp, supra,* p 431, and promises to convey land by will, *Hammel v Foor,* 359 Mich 392, 401; 102 NW2d 196 (1960), in addition to contracts involving the sale of land.

[94] *Davies v Martel Laboratory Services,* 189 Ill App 3d 694; 136 Ill Dec 951; 545 NE2d 475 (1989) (a promise of permanent employment on the condition that the plaintiff would receive an MBA degree was not violative of the statute of frauds despite the fact that attaining the degree would take two years, on the ground that the plaintiff's enrollment in an MBA program constituted part performance by her in reliance on the agreement).

G

The signers of the lead opinion state that the sales representatives cannot maintain an action to recover for unjust enrichment. They should, however, be permitted to do so if the basis of the ruling against them is that their contracts of employment were within the statute of frauds. The Restatement of Contracts provides:

> Restitution When Contract Is Within Statute of Frauds
> A party who would otherwise have a claim in restitution under a contract is not barred from restitution for the reason that the contract is unenforceable by him because of the Statute of Frauds unless the Statute provides otherwise or its purpose would be frustrated by allowing restitution. [3 Restatement Contracts, 2d, § 375, p 219.]

Illustration 1 to comment (a) indicates that an employment contract violative of the one-year statute is a contract for which a restitutionary or quasi-contract recovery is permitted:

> A makes an oral contract to furnish services to B that are not to be performed within a year (§ 130). After A has worked for two months B discharges him without paying him anything. A can recover from B as restitution the reasonable value of the services rendered during the two months. [*Id.,* p 220.]

Accordingly, even assuming that the oral contracts of employment are within the statute of frauds, the sales representatives are entitled to recover the reasonable value of their services in building the books of business *if* the promise to pay a seven percent commission on policy renewals of old sales was in part a promise to pay

deferred compensation for making the new sale.[95] This, of course, brings one back to the underlying question whether the correct construction of the oral contracts of employment—whether within or without the statute of frauds—was that the Auto Club promised to pay the sales representatives a seven percent commission on policies first written before 1978 and renewed after 1977.

MALLETT, J., took no part in the decision of this case.

APPENDIX

III. SUMMARY OF ARGUMENT

1. There was no breach of any contract with the Group A plaintiffs under either alternative prong

---

[95] See also *Oxley v Ralston Purina Co,* 349 F2d 328 (CA 6, 1965), where the United States Court of Appeals for the Sixth Circuit, after adverting to *McLaughlin,* held that an oral agreement between a farmer and a corporation, whereby the farmer was to begin a hog-leasing program on his farm, with the corporation to later take and dispose of the farmer's surplus stock, which agreement was not to be performed within a year, should be enforced against the corporation on a theory of equitable estoppel, where the farmer relied on such agreement and made extensive investments for the purpose of carrying it out. In the instant case, the sales representatives claim that they made extensive investments of time and energy in an effort to build the books of business.

of *Toussaint. First,* assuming a legitimate expectation theory, the plaintiffs did not demonstrate that the Auto Club's modification of its compensation policy contravened the criteria of *In re Certified Question.* The Auto Club provided "reasonable notice of the change . . . uniformly given to affected employees." *In re Certified Question,* 432 Mich at [457]. It acted in good faith for a legitimate business reason. *Second,* under an express contract approach, the Group A plaintiffs' contract claim similarly must fail. There was admittedly no durational term to their contract[96] and any agreement could, accordingly, be altered at will. Moreover, the Auto Club's announcement of a new compensation policy was an offer to modify any pre-existing contract which was accepted[97] when the plaintiffs thereafter worked pursuant to that new policy for five years before filing this lawsuit.

2. There was also no breach of any contract with the Group B and C plaintiffs. If their claim is

---

[96] This was the first reason stated in the motion for summary disposition.

The motion stated that "there is no genuine issue of material fact and that Defendant is entitled to judgment as a matter of law. In support hereof, Defendant submits the attached memorandum of law."

The attached "Memorandum in Support of Defendant's Motion for Partial Summary Disposition" stated:

> For the [*four*] *reasons* set forth below, the remaining part of plaintiffs' renewal commission claims should be dismissed.
>
> *First,* the deposition testimony of one hundred thirty-nine (139) of the plaintiffs demonstrates that while they were told at or around the time of hire that they would receive a seven percent (7%) commission on renewals, *there was no discussion whatsoever* regarding the term, duration, or manner of termination of this alleged "contract." Thus, under *Lichnovsky v Ziebart International Corp,* 414 Mich 228 [241-242]; 324 NW2d 732 (1982), to whatever extent, if any, the parties had a "contract" regarding compensation, that contract was terminable at will. [Emphasis added.]

[97] The question whether there was a genuine issue of material fact concerning whether the sales representatives "accepted" the new compensation system was not one of the four reasons specifically identified in the Auto Club's motion for summary disposition.

analyzed under a legitimate expectation approach, the result is the same as that of the Group A plaintiffs. If, instead, the Group B and C plaintiffs' claim is determined under an express contract theory, the addition of a "forever" durational term either adds nothing or, at most, only infuses their contracts with a just cause requirement for modification. Just cause was patently present here where the compensation policy change was undisputedly motivated by legitimate business reasons.[98] The Group B plaintiffs' contract claim should additionally be barred by the Statute of Frauds.[99] Any contract those plaintiffs had with respect to renewal commissions could be neither performed nor breached in the first year of their employment. Moreover, their alleged contract contemplated a duration of more than one year and, in the context

---

[98] The "legitimate business reasons" were asserted in the following manner as the fourth reason:

> *Finally,* even if the claims of all of the plaintiffs are treated as arising under some integrated "just cause" employment contract, their claims are barred by collateral estoppel. The change in the commission system was previously litigated in *Automobile Club of Michigan and Michigan AAA Sales Association, Inc ("Auto Club I"),* Case No. 7-CA-15209, 7-CA-15400 (National Labor Relations Board, August 7, 1979). The Law Judge's finding that the change was motivated by legitimate business considerations and was, thus, for cause, is binding on the plaintiffs.

There was, again, an affidavit asserting that the change in the compensation system was motivated by economic need, but this was not one of the four stated reasons specifically identified in the motion for summary disposition.

[99] This was the second reason, which was stated in the memorandum attached to the motion for summary disposition as follows:

> *Second,* fourteen (14) other plaintiffs testified in their depositions that at or around the time of hire they were orally told that the seven percent (7%) commission on renewals would be paid "forever," or words to that effect. However, these sales representatives could not receive any renewal commissions for at least their first year of employment. Because the alleged oral promise of a seven percent (7%) renewal commission was incapable of being performed within one year, the claims of these plaintiffs are barred by the statute of frauds.

of employment contracts, as other courts have concluded, such an agreement must be in writing. The Group c plaintiffs' contract claim contains a further defect: lack of any consideration beyond the pre-existing cooperation and loyalty those plaintiffs had already committed to perform.[100]

3. There was no unjust enrichment as a result of the change in the compensation policy. All plaintiffs were paid in full consistent with the commission policies which they knew in advance would apply to the transaction. The conclusion reached by the Court of Appeals—that the Auto Club confiscated the books of business that had been assigned to the sales representatives—was erroneous. There was no confiscation of books of business occasioned by the compensation policy modification.[101]

---

[100] This was the third reason, which was stated in the memorandum attached to the motion for summary disposition as follows:

*Third,* twenty (20) other plaintiffs testified in their depositions that, sometime subsequent to their commencement of employment, they were orally told that the seven [percent] (7%) commission on renewals would be paid "forever," or words to that effect. Their claims are barred because there was no exchange of any additional consideration beyond their normal services. Absent special consideration, any post-hire reference to a seven percent commission "forever" is unenforceable as a matter of law.

[101] The factual assertions in this paragraph were not among the four reasons specifically identified in the motion for summary disposition.